MARY FRITZ, as Administratrix of the Estate of GEO. W. SILKETT, Deceased, Respondent, v. THE WESTERN UNION TELEGRAPH COMPANY, a Corporation, and THE RIO GRANDE WESTERN RAILWAY COMPANY, a Corporation, Appellants.

No. 1387. (71 Pac. 209.)

1. **Telegraph Companies: Negligence: Construction of Line: Proper Method: Evidence: Experts.**
   In an action against a telegraph company for the death of one of its linemen while putting up a wire which crossed the feed wires of an electric light company, the question as to how many linemen there should be in stringing wires over feed wires, and as to where the men should be stationed, was a proper subject for expert testimony.

2. **Same: Evidence.**
   In an action against a telegraph company for negligence causing the death of a servant putting up a wire over the feed wires of an electric light company, and who was killed by an electric current caused by contact with the electric light wires, evidence as to the ordinary method existing among telegraph

companies as to providing insulators, and as to the number of wires that should be strung at any one time, was not objectionable, as an insufficient manner of proving the existence of a custom, inasmuch as the evidence was not to prove a custom, but merely to show the ordinary manner in which such work is performed, as bearing on the question of negligence.[1]

### 3. Same: Opinion.

It appeared that deceased was directed to take the place of another workman who had received a shock from the telegraph wire while pulling on it, and who stated that fact to deceased. This workman was asked with regard to the appearance of deceased at the time he came to take his place—as to whether deceased appeared to realize there was any danger— and answered that he appeared as though there was no danger, and looked at witness in a disgusted way, as much as to say that witness did not know anything about it. *Held*, not objectionable, as stating a conclusion.

### 4. Damages: Testimony too Remote.

Where it had been proven that deceased was unmarried, and at various times had sent sums of money to his parents, testimony as to whether or not deceased at the time of his death was paying attentions to some young lady was properly excluded as too remote to affect the question of damages.

### 5. Same: Acting Foreman: Authority as a Subagent.

A general superintendent was placed in charge of the construction of a telegraph line, which required the services of nine or ten men, and necessitated the direction of these men by a foreman. The superintendent employed an acknowledged foreman, who had the key to a box car containing the tools used by the men. This foreman was discharged, and subsequently another workman took his place, and took charge of the tools and general supervision of the work. *Held*, to justify an inference that the latter foreman had authority as a subagent.[2]

### 6. Same: Evidence as to Wages Held too Remote to Show Status of Acting Foreman.

Upon an issue as to whether or not a certain laborer, alleged to have charge of a gang of men, was a vice-principal, testimony to show that the alleged vice-principal received no greater wages than the other men was too remote.

---

[1] Nelson v. Southern Pac. Co., 15 Utah 325, 49 Pac. 644, distinguished.

[2] Mickelson v. Railway Company, 23 Utah 42, 64 Pac. 463.

Fritz, Admx., v. Western Union Tel. Co. et al.

**7. Same: Administrator Proper Party to Sue: Recovery a Bar.**

In an action for negligent death, the fact that the only heirs of decedent had, prior to the commencement of the action, assigned all their interest in the cause of action to the administrator of the deceased, who appeared as plaintiff, was no bar to the action, since, under Revised Statutes, section 2912, the administrator was entitled to sue in his own right, and a recovery by him would have been a bar to any subsequent action.

**8. Same. Waiver of Objection.**

The objection that the plaintiff in an action is not the real party in interest, when available by way of defense, must be raised by demurrer or answer, or it will be considered to have been waived.

**9. Same: Instructions.**

It is not error to refuse an instruction which has been substantially given in a former instruction.

**10. Same: Applicable to Evidence.**

Instructions not applicable to the evidence are properly refused.

**11. Same.**

In an action for negligent death, the court instructed as follows: "By 'contributory negligence' is meant such a want of reasonable care and caution on the part of a person injured as directly contributed and caused the injury, and without which such injury would not have occurred; and if you find from the evidence that the deceased failed and neglected to use such reasonable and ordinary care and prudence, and that such failure contributed to the happening of the accident, and without which the accident would not have happened, you should find for the defendant." *Held,* not erroneous when considered as a whole.

(Decided January 15, 1903.)

Appeal from the Third District Court, Salt Lake County.— *Hon. C. W. Morse,* Judge.

Action to recover damages for the wrongful death of the plaintiff's intestate alleged to have been caused by the negligence of the defendants. From a judgment in favor of the plaintiff, the defendants appealed.

AFFIRMED.

*Messrs. Bennett, Sutherland, Van Cott & Allison* for appellant, The Rio Grande Western Railway Company.

The testimony of experts is inadmissible upon a matter concerning which, with the same knowledge of the facts, the opinion of anyone else would have as much weight. It is only admissible when the facts to be determined are obscure, and can only be made clear by and through the opinions of persons skilled in relation to the subject-matter of inquiry. Rogers Ex. Test., sec. 8; Lawson Ex. and Op. Ev., 238 et seq.; Glass Co. v. Lovell, 7 Cush. (Mass.) 319.

The test of the admissibility of expert evidence is not whether the subject-matter is common or uncommon, nor whether the witness can claim superior judgment or powers of reasoning, or better comprehends and appreciates the matter at issue, but the test is whether the question upon which the evidence is offered is one of science or skill. 12 Am. and Eng. Enc. of Law, 423; Taylor v. Monroe, 43 Conn. 36; State v. Watson, 65 Me. 74; Glass Co. v. Lovell, 7 Cush. (Mass.) 319; Chicago v. McGiven, 78 Ill. 347.

In order to make a custom obligatory, it must be so ancient as to be generally known, certain, uniform and reasonable. Collins v. Hope, Fed. Cas. No. 3003; West v. Ball, 12 Ala. 340; Nelson v. Southern Pac. Co., 15 Utah 329; Hall v. Storrs, 7 Wis. 253; Steele v. McTyers, Admin., 70 Am. Dec. 516; Savage v. Pelton, 27 Pac. 948; 2 Greenl. Ev., sec. 251; Sturges v. Buckley, 32 Conn. 18; Dixon v. Dunham, 14 Ill. 324; Caldwell v. Dawson, 61 Ky. 121; Porter v. Hills, 114 Mass. 106; Stewart v. Scudder, 24 N. J. Law 96; Miller v. Burke, 68 N. Y. 615; Walker v. Borm, 6 Minn. 508.

To establish a custom it is not enough to prove that the act has been frequently done. It must be shown to be so generally known and recognized that a fair presumption

arises that the parties, in entering into their engagements, do it with a silent reference to the custom, and tacitly agree that their rights and responsibilities shall be determined by it. The Paragon, Fed. Cas. No. 10708; Citizens' Bank v. Grafflin, 31 Md. 507; Ins. Co. v. Stanton, 10 Miss. 340; Martin v. Hall, 26 Mo. 386; Duguid v. Edwards, 50 Barb. 288; Fletcher v. Teekell, 1 R. I. 267.

The custom, even if it existed, was unreasonable and therefore void. It was said by this court in the case of Nelson v. Southern Pacific Co., 15 Utah 331, that to establish the validity of a custom it must be shown to be reasonable. And it is the universal rule that customs and usages are not valid unless they are reasonable. Leach v. Perkins, 17 Me. 462; s. c., 35 Am. Dec. 268; Strong v. R. Co., 15 Mich. 206; s. c., 93 Am. Dec. 184; Duguid v. Edwards, 50 Barb. 288; McMasters v. R. Co., 69 Pa. St. 374.

And the reasonableness, validity and effect of a custom are questions of law for the court. Sullivan v. Jernigan, 21 Fla. 264; Chicago, etc., Co. v. Tilton, 87 Ill. 547; Milroy v. Ry. Co., 98 Iowa 188; s. c., 67 N. W. 276; Bodfish v. Fox, 23 Me. 90; s. c., 39 Am. Dec. 611; Bourke v. James, 4 Mich. 336.

A custom establishing a hard and fast rule that in doing such work there must be a man on each pole, only one wire strung at a time, and a foreman always present, is unreasonable and void. Reed v. Richardson, 98 Mass. 216; Nolte v. Hill, 36 Ohio St. 186; Jacobs v. Shorey, 97 Am. Dec. 586; Simonds v. Baraboo, 93 Wis. 40; s. c., 57 Am. St. Rep. 895; Stoney v. Trousp Co., 17 Hun. 579; Redfield v. Ry. Co., 112 Cal. 220, 224.

The customs sought to be proved were local, and confined to one particular business. They were not claimed to be general and of universal application. Being a purely local custom of a particular place and confined to a particular business, it can be operative only in respect to those persons who are shown to have knowledge of it. Marshall v. Perry,

67 Me. 78; Chalearegay, etc., Co. v. Blake, 144 U. S. 476; Rindskoff v. Barrett, 14 Iowa 101; Higgins v. Moore, 34 N. Y. 425; Sawtelle v. Drew, 122 Mass. 228; Isaksson v. Williams, 26 Fed. 642; Flatt v. Osborne, 33 Minn. 98; Johnson v. Gilfallin, 8 Minn. 352; Leonard v. People, 30 Ga. 61; City Bank v. Cutter, 20 Mass. 414; Byrne v. Packing Co., 137 Mass. 313; Hutchings v. Todd, 16 Mich. 493; Fitzgerald v. Hanson, 16 Mont. 474.

*Lindsay R. Rogers, Esq.*, for appellant, The Western Union Telegraph Company; *George H. Fearons, Esq.*, of counsel.

*Messrs. Powers, Straup & Lippman* for respondent.

### STATEMENT OF FACTS.

On October 27, 1898, and for several months immediately prior thereto, the defendants, the Western Union Telegraph Company and the Rio Grande Western Railway Company, were engaged in constructing a telegraph line between Park City and Salt Lake City, along the line of the Rio Grande Western railroad track. The work of erecting the line had been proceeding for about four months, and George Silkett, the deceased, had been in the employ of the defendants as a groundman during all of that time. On October 27, 1898, the day of Silkett's death, the constructing had progressed to a point at Sugar, in Salt Lake county, where the projected line passed over and across the feed wires of the Salt Lake & Ogden Light & Power Company, which wires carried a very heavy voltage of electricity, and where the men, including deceased, were then engaged in stringing telegraph wires. Up to this time nine or ten men had been employed in the gang, including a foreman or an assistant, who had charge of the work and directed the men. There were telegraph and telephone poles standing on each

side of the feed wires of the power company at the point where the work was going on; and it was testified that, under such circumstances, it was usual to string only one wire at a time, and to have a lineman on each pole to take up and keep up the slack; also to use rubber gloves for insulators, and a wooden platform for the men to stand on, to insulate them from the ground. None of these things, however, were furnished that day to the men there working. It seems that some of the workmen procured a coil of telegraph wire from a railroad car near by, and placed it in the back of a wagon, whereupon the wagon containing the coil of wire was placed on the west side of the feed wires, with the rear of the wagon facing said feed wires. It then became necessary to uncoil the wire from the reel in the wagon, and stretch the same over the feed wires from the telegraph pole on the west side to the telegraph pole on the east side thereof. There were two coils of telegraph wire on the reel, and by the revolution of the reel the two coils of wire were run out, preparatory to stringing them from pole to pole over the feed wires. A hand line or rope was tied to the ends of the two telegraph wires on the west side of the feed wires. The regular foreman was absent, and one Buchanan, who then directed the men, threw the hand line over the top of the feed wires, and onto the east side thereof. Some of the men picked up this hand line on the east side, and pulled or carried it to the telegraph pole on the east side of the feed wires, preparatory to carrying it up the pole. Buchanan went up a telephone pole on the west side of the feed wires, and put the two telegraph wires, which were being stretched over the top of a cross-arm of the telephone pole, in order to use the cross-arm as a support for the telegraph wires while they were being placed in position. Buchanan then descended the telephone pole on the west side of the feed wires, leaving no one there, and passed over and ascended the telegraph pole on the east side, taking the rope or hand line up the pole with him. After passing over the top of

the cross-arm of the telephone pole on the west side, one of the telegraph wires became caught under an insulator on the telegraph pole, which was also on the west side, but nearer the feed wires than the telephone pole. Deceased and one George Arden were on the east side of the ground, near the base of the telegraph pole on top of which Buchanan was stationed, and were engaged in pulling on the hand line to keep the wires tight while they were being stretched. The hand line or lead line also went up over a cross-arm on the telegraph pole on the east side, on the top of which Buchanan was stationed, and from there down to the ground into Arden's hands. Buchanan thereupon told Arden to give a little pull on the rope. At this time deceased was standing by Arden's side, at the foot of the pole. Arden responded with a pull, but one wire was caught on the west side, as above stated, and therefore refused to yield. Buchanan thereupon sent deceased to the west side to release the wire which was caught, saying at the same time: "Go over where Jones is, and get hold of the wires, and let them come east." Deceased proceeded to the west side of the feed wires, and took a position near Jones at the rear end of the wagon. Arden continued to pull on the hand or lead line to keep the wires tight. Jones had already shouted to Buchanan that he would go no further, as he had received a shock which alarmed him. It was in response to this announcement of Jones' that Buchanan requested deceased to go over and assist Jones. Jones had been standing on a board insulator at the rear end of the wagon, but, when deceased arrived, Jones stepped from the insulator, and deceased took his place. As deceased stepped onto the board, Jones said to him: "George, she is a crackerjack. I had a touch, and it liked to snake my head off." Thereupon deceased, who had a pair of gloves on his hands, seized the two wires in his hands, and commenced to pull, when a sudden flash came, a current of electricity passed over the wires, and deceased dropped prostrate on the ground and expired. While nobody actually saw it,

it is evident that the telegraph wires sagged down and came near to or in contact with the feed wires of the power company, carrying a heavy voltage of electricity, thereby diverting the electric current over the former wires and causing deceased's death. Deceased was unmarried, thirty years old, healthy, industrious, and ablebodied, and supported his father and mother, aged, respectively, at that time, seventy and sixty-five. It was shown that he sent them money right along each month, and on one occasion sent them $125. Suit was brought by the administratrix of the estate of the deceased against the defendants, claiming that their negligence had caused the death of her intestate. Upon the trial, plaintiff had verdict and judgment for $4,000, from which judgment this appeal is taken.

ROLAPP, District Judge, after stating the facts, delivered the opinion of the court.

Upon the trial of this case a large number of errors were assigned, most of which relate to the admissibility of certain evidence now forming part of the record. It appears that, among other things, one of plaintiff's witnesses was permitted, over the objection of defendants, to state how many linemen there should be in stringing wires over feed wires, and where the men should be stationed. The specific objection to the questions which caused these answers was that the testimony was immaterial, irrelevant, and incompetent; that it was not a subject-matter of expert testimony, and presented a question of fact, to be determined by the jury from the evidence. Objection was also made that the witness was not qualified to testify; but this part of the objection we need not consider, because the record discloses that his qualification as an expert was supported by some evidence, and whenever that appears we will not ordinarily review the action of the trial judge in permitting such witness to testify. Rog. Exp. Test., sec. 22; 2 Jones, Ev., sec. 371. But counsel for appellants insist that the subject-

matter of inquiry was of such a character as to lie within
the common experience of men moving in the ordinary walks
of life, and therefore invoke the rule that under such circum-
stances the opinions of experts are inadmissible, as the jury
is supposed to be amply competent to draw all necessary
inferences from such common facts testified to by witnesses.
While this rule is well established, yet we think counsel are in
error in assuming that the subject-matter testified to in this
instance necessarily lies within the common experience of
men.    The inquiry did not simply relate to the mere hand-
ling of copper wire between elevated positions, but it in-
volved the question of the effect, method, and skill in hand-
ling such wire in close proximity to other wires heavily
charged with electricity.   We do not think it is true that
the average man is acquainted with the effects of electricity,
except as they produce almost unexplainable results to the
senses.   Ordinary men know nothing at all about the methods
by which these results are produced.   And therefore it may
be entirely probable that the ordinary number of men and
methods used for handling overhead wires in unobstructed
places, or places simply obstructed by materials other than
electrical, would be no guide whatever as to the number of
men and methods that should be employed in handling the
same wires when crossing other heavily charged electric wires.
In fact, in this very case it appears from the record that
slight or temporary contact of the construction wire with
the charged wire would have but a slight effect, while a greater
or more continuous contact would have a deadly effect.   The
amount of contact that could be avoided or safely permitted
by certain methods of handling the wires is certainly not
information within the knowledge of men possessed of aver-
age intelligence, but must require knowledge, skill, and judg-
ment possessed only by those who have made the science of
electricity a study.   It is true, evidence could have been
introduced as to the number of men usually employed in
handling such wires, and where they would be usually sta-

tioned; but such testimony would simply be either corrobora-
tive or contradictory of the opinion expressed, and, unless
such witness testifying to such facts possessed peculiar skill
or judgment in the manner of handling such wires under
such circumstances, the testimony would, after all, be of
little value in aiding the jury in determining the necessity
as to the number of men to be occupied in the stations des-
ignated. Nor do we think that the authorities cited by
counsel for appellants in support of their position apply to
the facts in this case, and the cases cited are readily dis-
tinguishable. We agree with the court in the case of Bald-
win v. Railroad Co., 68 Iowa 37, 25 N. W. 918, that it
does not require expert testimony to determine the proper
method of piling lumber so as to maintain its equilibrium.
Any ordinary man could determine that fact. So it is
clearly a matter to be determined by a man of ordinary intel-
ligence as to whether the absence of any hand hold upon a
freight car, made necessary by certain operations, was or
was not a defect. Dooner v. Canal Co., 164 Pa. 33, 30
Atl. 269. In the cases of Pennsylvania Co. v. Conlan, 101
Ill. 93, Railway Co. v. Armstrong (Tex. Civ. App.), 23
S. W. 236, and Jeffrey v. Railway Co., 56 Iowa 546, 9 N.
W. 884, the courts simply hold that expert evidence show-
ing that deceased did not exercise due care, or that the de-
fendant did exercise such care, was not admissible. Neither
could there be any occasion for expert testimony to determine
whether a fence would be sufficient to turn cattle (Enright v.
Railroad Co., 33 Cal. 230), because that certainly is a matter
of the most ordinary observation. So the case of Redfield v.
Railway Co. (Cal.), 43 Pac. 1117, is not in point, because,
while the court stated that that particular case "was not a
case where opinions were admissible as evidence," yet it
further appears from the testimony that the witnesses from
whom the expert testimony was attempted to be solicited
"could speak only from their observations of the fact, . . .

25 Utah—18

and not as to the reason or motive for doing so," and, further, that "these questions did not call for the opinions of these witnesses as experts, but practically called for the opinions of others as inferred from their conduct." So. in the case of Nutt v. Railway Co. (Or.), 35 Pac. 653, the real question determined was that it was not proper for a witness to state whether better appliances than those actually used might have been used in the fatal operation and incidentally the court advanced the opinion that the work of lowering tiles from a car to the ground by rolling them down some skids, aided by a rope wrapped around a stake, did not involve any work of special skill or knowledge, and in this we concur. The case of Flynn v. Light Co. (Mass.), 50 N. E. 937, is distinguishable from the case at bar in this: that in the case then before the court the subject-matter of inquiry, upon which expert testimony was sought to be introduced, related simply to the handling of wires from elevated positions, without the additional facts which appear in the case now before us, relative to the intervening and approximate situation of other wires heavily charged with electricity. While the rule laid down by the Massachusetts court in that case might be supported, yet we do not think the rule could properly be extended to include the facts in this case. The same is true of the case of Cahow v. Railway Co. (Iowa), 84 N. W. 1056. In that case two men were moving a locomotive tender by means of pinch bars, and, upon one of the men withdrawing his bar, the tender started backward and ran over plaintiff. It was there properly held that the question whether two men were sufficient to move the tender with safety was not a subject-matter for expert testimony, because, given the weight of the vehicle rolling upon a declining surface, it would require no man of more than ordinary capacity to determine the number of men of average strength necessary to stem its movements. But that case does not cover all the facts in this case. The ordinary deduction that men would make from testimony relating to the mere weight of the

wires, the situation and character of the poles, the number of men actually present, and all the other facts testified to in this case, would be practically useless, unless measured by the skilled information received by them relating to the handling of these men and things in connection with the mysterious factor of electricity. We do not think any further review of the cases cited would be profitable, as they all appear to be readily distinguishable from the case at bar; and, if it were simply a question of precedent, we find that many courts have gone much closer to the border line of admissible expert testimony than did the trial court in this case. Thus it has been held proper to ask an expert witness what course the defendant might have properly pursued for the relief of cattle while suffering from heat in a car. Lindsley v. Railway Co., 36 Minn. 539, 33 N. W. 7, 1 Am. St. Rep. 692. So, also, as to whether a raft was properly moored to prevent a collision. Hayward v. Knapp, 23 Minn. 430. What should have been done by a shipowner to prevent injuries to a cargo. Guiterman v. Steamship Co., 9 Daly 119. What kind of bridge-railing should have been provided? Taylor v. Town of Monroe, 43 Conn. 36. What the relative danger was in coupling cars having certain equipments. Railway Co. v. Frawley, 110 Ind. 18, 9 N. E. 594. What the best way was to handle heavy stones, with a derrick. Leslie v. Railroad Co. (Mass.), 52 N. E. 542. And so we might continue to cite a large number of cases where courts of high standing have permitted expert testimony to be given upon questions much more doubtful than those presented in this record. But we are fully convinced that the expert testimony admitted in this case comes absolutely within the rule, and that no error was committed in overruling appellants' objection in this regard.

Appellants further complain that error was committed in permitting witnesses to answer as to the ordinary and usual method existing among telegraph or telephone companies in regard to providing insulators, and as to the

number of wires that should be strung at any one time. The reason assigned for appellants' objection is that it is an improper and insufficient manner to prove the existence of a custom in this respect. We do not think that either the questions or answers objected to contained anything which even tended to show a purpose upon the part of respondent to prove the existence of any custom, or to bind the defendants by its existence. While it is true that the word "usage," "usual," "custom," or "ordinary," is used, yet it is quite apparent that the only object of the inquiry was to inform the jury as to the ordinary manner in which such work is performed, and from such testimony determine whether or not defendants were or were not guilty of negligence. The case of Nelson v. Southern Pac. Co., 15 Utah 325, 49 Pac. 644, cited by appellants, does not affect this case at all. That was a case where it was sought to prove an existing custom which would excuse an ordinarily negligent act; and, under those circumstances, it was held by this court that the existence of the custom at the time of the accident must be shown to have existed such a length of time as to become generally known, and must be reasonable, uniform, certain, and not contrary to law. But in this case it is not a question as to any custom existing permitting employees to act negligently, or as to the construction of any appliances, or in fact to any custom, in a legal, technical sense. As we conceive it, it is simply an inquiry as to the ordinary manner in which certain work is done, and we have been cited to no case where such testimony has been held inadmissible, but, on the contrary, courts have held that testimony tending to show that the customary manner of doing certain work (for instance, that a lineman was to determine for himself the safety of poles) was perfectly proper. Tracy v. Telegraph Co. (C. C.), 110 Fed. 103. So it has been held proper to testify as to the usual and customary time allowed at any station, not for the purpose of establishing any hard and fast rule as to the custom, but merely bearing upon the question

as to whether or not a reasonable time was allowed to enable passengers to safely leave a train.  Fuller v. Railway Co., 21 Conn. 557.

Appellants also assign as error the following questions and answers admitted in testimony by one of plaintiff's witnesses: "When you made that statement to him, state what his appearance was—as to whether he appeared, or not, to realize there was any danger? A. He certainly appeared to me as though there was no danger at all.  Q.  Describe his appearance as well as you can?  A.  He just looked at me in a disgusted way, like, as much as to say I did not know anything about it."  Objections were made mainly upon the ground that whether or not deceased realized the danger at that time was a mental question, which the witness had not shown himself capable of judging, and that the statement of witness that deceased looked in a disgusted way was a conclusion.  We think that both of these objections are untenable.  The statement as to the appearance of another is a fact, and not a conclusion, and any non-expert witness may be able, under certain circumstances, to determine whether or not another person realizes an impending danger. It appears from the record that, just before deceased took hold of the fatal wire which caused his death, the witness answering the above question stood by the side of deceased, and said to him: "George, she is a crackerjack.  I had a touch, and it liked to snake my head off."  Then, looking at deceased, the witness says that he did not appear to apprehend or realize the danger he had just mentioned, but looked disgusted.  It is urged by appellants that this statement is not only a conclusion, but an erroneous conclusion.  Of course, the correctness of the conclusion was a matter of fact to be determined by the jury; but we think that the statements made by the witness might be wholly consistent, and, while not very well or fully expressed, still state the facts as they appeared to him at that time.  The witness realized the danger, as evidenced by his remark; but the total absence of

fear or reluctance which might naturally be expected to produce itself upon the face of deceased must have been strongly impressed upon the witness's mind, especially as the deceased's only expression was one of disgust at the offered warning. Of course, whether or not the conduct or the appearance of the man just prior to his death evinced that care for his own safety that should be exercised by an ordinarily prudent person was a question of fact for the jury, but that does not affect the admissibility of the testimony. The experience of men teaches us that knowledge of danger produces external signs of fear, and also that the absence of such fear under impending danger either evinces absence of knowledge of such danger, or a disregard for its consequences. In either event, it is proper for the witness to state the appearance of a person who is subsequently the victim of the natural result of such danger. In the case of People v. Lavelle (Cal.), 12 Pac. 226, a non-expert was asked the question: "What was the appearance of this man at the time, with reference to his being rational or irrational?" This was objected to on the ground that the witness could not testify from appearances as to whether the man was rational or irrational. The court held the question to be a proper one, because "the evidence sought to be elicited was not the opinion of the witness as to the mental sanity of the defendant, based on an acquaintance with him, but was, rather, as to a fact, namely, his appearance at the time."

Appellants also assign as error the exclusion of their proffered testimony as to whether the deceased, an unmarried man, was at the time of his death paying attention to some young lady. Apart from the fact that no offer was made to prove that such attention would probably result in or lead to matrimony, we think the testimony was properly excluded as altogether too remote to affect the question as to whether such condition at the time of his death

would affect the support which he was likely to render to his parents, had he lived.

Appellants also complain that evidence was erroneously admitted respecting the authority which was given by the general foreman, placing Buchanan in charge of the work at the time the accident occurred. The contention is that the general foreman possessed no authority either express or implied, to employ any subagent. In this statement we can not agree. We think from the facts in the case that an implied authority did exist. The defendant had employed Mosher to have general charge of the construction of the telegraph line between Park City and Salt Lake City, which required the services of some nine or ten men. Up to about three days before the accident these men were directed by an asserted foreman, who had the key to a box car containing their tools. After his discharge, Buchanan took his place, and had charge of the tools. The evidence shows that the necessity of the work required a man constantly in charge, and that such a charge was vested in both Mosher and Buchanan. Under such circumstances, we think the authority of Buchanan may be implied. It is not necessary in every instance to show that a subagent has been expressly appointed by the master. Says Mr. Mechem, in his work on Agency: "It is obvious, too, that there are many cases where, from the very nature of the duty, or the circumstances under which it is to be performed, the employment of subagents is imperatively necessary, and that the principal's interest will suffer if they are not so employed. In such cases the power to employ the necessary subagents will be implied. The authority of an agent is always construed to include the necessary and usual means to execute it properly." In Shear. & R. Neg., sec. 156, it is said: "The master is, of course, liable for the negligence of one whom his servant employs by his authority to aid such servant in the master's business. Such authority need not be expressed, but may be implied from the nature of the business or the course of trade. Thus

such an authority would almost necessarily be implied in favor of a servant intrusted with the whole care of a farm, or the construction of a building, or distribution of a large quantity of goods, or any other task which could not be performed within a reasonable time by one man." If an exigency exists or arises making it necessary for the proper carrying out of the master's business that a subagent should be employed, then the authority so to do will be implied. Mickelson v. Railway Co., 23 Utah 42, 64 Pac. 463; Underwood v. Birdsell (Mont.), 9 Pac. 922. We think the court committed no error in admitting the testimony complained of, nor in refusing to give the instruction requested by appellants relating to this same subject-matter.

The trial court properly excluded appellants' proffered testimony tending to show that Buchanan received no greater wages than the other linemen. Such testimony was too remote to affect the question of whether or not Buchanan was a vice-principal. "The law requires an open and visible connection between the principal and evidentiary facts, and the deductions from them, and does not permit a decision to be made on remote inferences." Jones, Ev., sec. 137.

Appellants also strenuously insist that a peremptory instruction in their favor should have been given, because the parents of the deceased, and his only heirs, prior to the commencement of the action, had executed an assignment to plaintiff personally of all their right, title, and interest in the cause of action. We think the trial court correctly refused such instruction. While we do not think that such assignment is or can be valid or of any effect, yet, even if it were, still the real party pointed out by the statute, to-wit, the personal representative of the deceased, brought this action, and a judgment herein will be a complete bar to any action now or hereafter brought by the heirs or their assignee. Rev. St., sec. 2912. Besides, this objection was urged too late, and must be held to have been waived. "The

objection that the plaintiff in an action is not the real party in interest, as required by the Code, when available by way of defense, must be raised by demurrer or answer, or it will be considered to have been waived." 15 Enc. Pl. and Prac., 713; Rev. St., sec. 2966; Smith v. Hall, 67 N. Y. 50; Spooner v. Railroad Co., 115 N. Y. 30, 21 N. E. 696; Trust Co. v. Brown, 59 Mo. App. 461.

We also think that defendants' requests Nos. 8, 17, 15, and 22 were properly refused—the first two, because the matters therein contained had been covered in other terms by the general charge; the third, because it was not applicable to the evidence; and the last, because of both of the reasons which made it proper to exclude the first three.

Nor do we think that any error was committed in giving instruction No. 7. That instruction reads as follows:

"(7) By 'contributory negligence' is meant such a want of reasonable care and caution on the part of a person injured as directly contributed and caused the injury, and without which such injury would not have occurred; and if you find from the evidence that the deceased, George Silkett, failed and neglected to use such reasonable and ordinary care and prudence, and that such failure contributed to the happening of the accident, and without which the accident would not have happened, you should find for the defendants." While the first part of the instruction is open to criticism, yet we think that, read in connection with the latter part of the instruction, and considered as a whole, it is not misleading, nor does it constitute reversible error.

We see no reversible errors in the record, and the judgment is therefore affirmed, with costs.

BASKIN, C. J., and BARTCH, J., concur.