LOUISE HAMBURGER, Appellant, *v.* CORNELL UNIVERSITY, Respondent.

Charitable institutions — negligence — Cornell University a charitable institution and not liable for errors of professors, instructors or teachers — must exercise care and diligence in selecting agencies of service — injury to student from explosion while making experiment with chemicals in course of studies — university not liable, in absence of evidence that instructors or servants were incompetent, where only by conjecture or suspicion could conclusion be reached that explosion was result of negligence of servant rather than that of instructor.

1. Cornell University is a charitable institution immune from liability for the errors of professors or instructors or other members of its staff of teachers and is not to answer in damages because false or pernicious doctrine is imparted to its students in laboratory or clinic, or because a warning of the danger of some experiment has been inadvertently omitted, or because either in performing the experiment or in supervising it, a teacher has combined the wrong ingredients or allowed them to be combined by others.

2. There is no adequate distinction between the negligent use of a chemical in the course of an experiment and its negligent use or handling in preparation for an experiment, and where the staff of teachers were not charged with any duty in respect of the general care of chemicals and what they did was not to be done until the

present exigencies of instruction required them to do it and was then limited accordingly, the consequences of their negligence in the fulfillment of duties incidental to the teaching function may not be charged to the university. It owes to its students, however, a duty of care and diligence in the selection of all who are to serve it whether as members of the teaching staff or otherwise.

3. Where in an action brought by a student against Cornell University to recover for personal injuries caused through an explosion of chemicals with which she was conducting an experiment in the chemical laboratory according to instructions, it appeared that the explosion was probably caused by her obtaining or being furnished with a wrong chemical and there was evidence from which the inference might be drawn that this was due to the fault of an instructor but there is no assertion that the instructors were incompetent and no evidence that the administrative employees, who had charge of the chemical storeroom, were incompetent, when their qualifications are measured by the nature of the tasks assigned to them, nor any evidence that their incompetence, if proved, had a causal relation to the explosion and where only by basing a conclusion upon conjecture or suspicion could a jury reach a verdict that negligence of a servant rather than negligence of an instructor was the cause of the disaster, the plaintiff cannot recover.

*Hamburger* v. *Cornell University*, 204 App. Div. 664, affirmed.

(Argued May 11, 1925; decided June 2, 1925.)

Appeal from a judgment, entered July 14, 1923, upon an order of the Appellate Division of the Supreme Court in the third judicial department, reversing a judgment in favor of plaintiff entered upon a verdict and directing a dismissal of the complaint.

*Nash Rockwood, Charles T. Lark* and *Harry P. Pendrick* for appellant. The defendant is not a charitable or eleemosynary institution in the sense that it is exempt from liability to students for its negligence. (*People ex rel. N. Y. Inst.* v. *Fitch,* 154 N. Y. 14; *Gartland* v. *N. Y. Zool. Society,* 135 App. Div. 163; *Green* v. *State,* 107 Misc. Rep. 557; *Green* v. *Cornell University,* 193 App. Div. 924; 233 N. Y. 17; *Herman* v. *Bd. of Education,* 234 N. Y. 196; *Schloendorf* v. *N. Y. Hospital,* 211 N. Y.

125; *Amer. Academy* v. *Harvard College*, 12 Gray [Mass.], 582; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Chapin* v. *Holyoke Y. M. C. A.*, 165 Mass. 280; *Gamble* v. *Vanderbilt University*, 200 S. W. Rep. 510.) Even if defendant was a charitable institution generally as held, still it is not immune from liability for its negligence to plaintiff, because plaintiff was not a beneficiary of defendant. (*Buchanan* v. *Tilden*, 158 N. Y. 109; *Seaver* v. *Ransom*, 224 N. Y. 240; *De Cicco* v. *Schweizer*, 221 N. Y. 437; *Lawrence* v. *Fox*, 20 N. Y. 268; *Heskell* v. *Auburn Light, Heat & Power Co.*, 209 N. Y. 88; *Kellogg* v. *C. C. Foundation*, 203 N. Y. 191; *Hordern* v. *Salvation Army*, 199 N. Y. 233; *Chapin* v. *Holyoke Y. M. C. A.*, 165 Mass. 280; *Goodman* v. *Bklyn. H. O. Asylum*, 178 App. Div. 682; *St. Paul Sanitarium* v. *Williamson*, 14 A. L. R. 601; 164 S. W. Rep. 36; *Goldstein* v. *N. Y. University*, 76 App. Div. 80; *Sampson* v. *Columbia University*, 101 Misc. Rep. 146.)

*Frederick Collin* and *Mynderse Van Cleef* for respondent. The trial justice erred in ruling that the doctrine of *respondeat superior* applied to the evidence. The legal duties of the defendant concerning the plaintiff were not those imposed and charged by the court. (*Unger* v. *Lowry*, 236 N. Y. 73; *Butterworth* v. *Keeler*, 219 N. Y. 446; *Parks* v. *Northwestern University*, 218 Ill. 381; *Dexter* v. *Harvard College*, 176 Mass. 192; *Richards* v. *Wilson*, 185 Ind. 335; *Gamble* v. *Vanderbilt University*, 138 Tenn. 616; *Richardson* v. *Harvard College*, 208 Mass. 311; *Collins* v. *New York Post Graduate M. S. & H.*, 59 App. Div. 63; *Currier* v. *Trustees of Dartmouth College*, 105 Fed. Rep. 886; *Butler* v. *Berry School*, 27 Ga. App. 544; *Trustees of Washburn College* v. *O'Hara*, 75 Kans. 700.) Cornell University, being a charitable corporation, was not as to its students, and as to the plaintiff, a student, subject to the doctrine of *respondeat superior*. (*Hordern* v. *Salvation Army*, 199 N. Y. 233; *Schloendorff*

v. *New York Hospital*, 211 N. Y. 125; *Kellogg* v. *C. C. Foundation*, 203 N. Y. 191; *Matter of Bernstein* v. *Beth Israel Hospital*, 236 N. Y. 268; *Phillips* v. *Buffalo General Hospital*, 207 App. Div. 640; *Hamburger* v. *Cornell University*, 204 App. Div. 664.) The evidence did not establish any negligence on the part of the defendant, and the court should have directed a verdict in its favor, as requested. (*White* v. *Lehigh Valley R. R. Co.*, 220 N. Y. 131; *Patton* v. *Texas & Pacific Ry. Co.*, 179 U. S. 658; *Alvina* v. *Public Service Ry. Co.*, 117 Atl. Rep. 709; *Bruckel* v. *Milhau's Son*, 116 App. Div. 832; *Licari* v. *Markotos*, 110 Misc. Rep. 334; *Ohio Building Vault Co.* v. *Industrial Board of Ill.*, 277 Ill. 96; *Smith* v. *Lawrence*, 98 Me. 92; *Pinter* v. *Wenzel*, 173 Wis. 84; *Armour & Co.* v. *Harcrow*, 217 Fed. Rep. 224; *Seavey* v. *Laughlin*, 98 Me. 517; *Southern Ry. Co.* v. *Derr*, 240 Fed. Rep. 73.)

CARDOZO, J. · Plaintiff was injured by the explosion of chemicals while a student in a chemical laboratory in Cornell University. She charges that the explosion was due to the negligence of professors and instructors, and to the incompetence as well as negligence of subordinate servants. The Appellate Division, reversing a judgment in her favor, has dismissed the complaint. The question to be determined is the extent of the defendant's immunity as a charitable institution.

Students in the chemical laboratory were notified January 12, 1916, that they were to perform two experiments, one designated No. 84, the other No. 88. No. 84 involved the use of potassium chlorate and strontium nitrate. No. 88 involved the use of mercuric sulphide and calcium oxide or powdered lime. The first experiment was performed without accident, though plaintiff did not personally take part in it. In connection with the second, the accident occurred. There were supply tables in the laboratory, on which it was the practice of the instructors to place the cheaper kinds of chemicals

that were to be made use of by the students in the program of the day. There was also an adjoining storeroom, where other chemicals, more expensive, were handed out through a window. The plaintiff was informed by notice on the blackboard that the potassium chlorate for No. 84 and the calcium oxide for No. 88 were to be procured from the supply tables (of which there were several in the laboratory), and that the mercuric sulphide would be given out from the storeroom. She went to a supply table, and finding there a bottle labeled calcium oxide, she measured out the prescribed quantity and left it on her desk. This is her testimony, though the defendant rejects it, and insists that the contents of another bottle, labeled potassium chlorate, were taken by mistake. Both chemicals are white, though one is crystalline and the other not; and confusion would be easy if labels were disregarded. The next thing to be done was to get the mercuric sulphide. Plaintiff went to the window of the storeroom, and received what she described as a reddish-black powder, which was handed to her through the window by a boy within. Ahead of her was another student, one Feuerstein, who received a similar portion. Both Feuerstein and plaintiff then went back to their desks. There is testimony by the instructors that many other students had already completed the experiment without accident. Plaintiff mixed the chemicals in a mortar, and poured some of the mixture into a glass tube which she sealed with the aid of an instructor who was standing by. When the tube with the mixture in it was placed over the flame of a Bunsen burner, an explosion followed. Plaintiff lost the use of an eye as a result of her injuries. While she was preparing for the experiment, Feuerstein, the student who was ahead of her at the storeroom, suffered slight injuries through an explosion at the other end of the laboratory. The professor in charge caused one of his assistants to gather together the remnants of the chemicals at Feuerstein's

1925.]                Opinion, per CARDOZO, J.        [240 N. Y. 328]

desk and also at the plaintiff's. In each instance the ingredients found upon analysis were mercuric sulphide and potassium chlorate instead of mercuric sulphide and calcium oxide. A bottle of black mercuric sulphide from which students had been supplied from the storeroom was also analyzed. It was pure except for a very faint trace of sodium, so small as to be harmless, and discoverable only as the result of chemical analysis. There had also been in use in the storeroom that day a bottle of red mercuric sulphide, which, however, was not analyzed, except as it may have been included in what was left upon the desks. The evidence is that there is no risk of explosion through the mixture and heating of mercuric sulphide and lime. Such a risk exists, however, when the lime is replaced by potassium chlorate, though even then there is need, it seems, of the addition of organic matter, such as dust or wood or paper. The potassium chlorate used was proved to be the commercial product, in which particles of organic matter can occasionally be found. The defendant's explanation of the accident is that the plaintiff brought it about by taking potassium chlorate from the supply tables when she ought to have taken lime. The plaintiff's explanation is or seems to be that something other than mercuric sulphide was dispensed at the window of the storeroom.

We have yet to state the system or practice under which laboratory and storeroom were provided with supplies. Chemicals were bought from accredited manufacturers, and upon delivery at the university, with labels already on them, were placed in the main storeroom located in the basement. The storeroom clerk in charge of them, though not a trained chemist, had an experience of forty years. From this storeroom, supplies were sent, when called for, either to the laboratory, where teachers or students conducted their experiments, or to the secondary storeroom adjacent to the laboratory. This secondary storeroom was in charge of one Hagin, not

a chemist, who was assisted to some extent by his son, a boy of fifteen years. Distribution from the main storeroom to the secondary storeroom and the laboratory was in charge of a committee of instructors in the chemistry department, known as the re-agents committee. When the work of a day included experiments by the students, one or more of these instructors procured, in preparation for such experiments, the necessary chemicals. This they did personally. Neither the selection of the chemicals nor the transfer from the larger containers in the storeroom to the smaller cans or bottles was left to the storeroom clerks. Sometimes, when there was not time during one day for all the sections of a class to complete the experiments included in the schedule, the chemicals were left in their bottles or cans on the laboratory supply tables or in the secondary storeroom till the class met again. As a rule, the supplies were changed or replenished at the beginning of the day.

In preparation for experiments Nos. 84 and 88, an instructor went to the main storeroom, and took from the proper containers the requisite quantities of potassium chlorate and calcium oxide, which he transferred into bottles on the laboratory supply tables. His testimony is that in each instance the proper label was affixed. He also brought to the secondary storeroom a bottle or can of black mercuric sulphide. He poured out some of the contents upon a shelf, and indicated to Hagin the quantity to be placed upon slips of paper and handed to the students as they made application at the window. Before the experiment was over, this supply was used up, and an additional supply, this time red in color, was procured from another instructor, a member of the committee. The testimony shows that mercuric sulphide may be red as well as black. No other chemical was dispensed at the window during the day for this experiment or for any other. There was thus no opportunity, it would seem, for error or confusion on the part of Hagin

or his son in the handling of ingredients. All that the son did was to deliver to the students the slips of paper already prepared by the father under the directions of an instructor. With the work of preparation the boy had nothing to do.

The trial judge left it to the jury to say whether the defendant had been negligent in omitting to subject the ingredients to chemical analysis or in selecting incompetent custodians for the storeroom or in distributing through the storeroom window a chemical other than mercuric sulphide. With the tacit, if not express, approval of counsel for the plaintiff, he refused to submit to the jury any question in respect of the mislabeling of the calcium oxide, taking the ground that no mislabeling had been proved, and that defendant's fault, if any, was in the distribution of the other ingredient. The Appellate Division held that the defendant was immune from liability to its students for the negligence of its administrative servants as well as of its teachers, and this though incompetent servants had been negligently chosen.

Cornell University is a charitable institution (*Unger v. Loewy,* 236 N. Y. 73, 78; *Butterworth v. Keeler,* 219 N. Y. 446, 449; *Schloendorff v. Soc. of N. Y. Hosp.,* 211 N. Y. 125). As such, in its relation to its students, it has the benefit of certain immunities not shared by institutions organized for profit. The subject has had its chief consideration in actions against hospitals. Through such litigation, the rule is settled in this State, and generally elsewhere, that a hospital, if public or charitable, is not liable for the negligence of its surgeons or physicians in the treatment of its patients (*Schloendorff v. Soc. of N. Y. Hosp., supra; Phillips v. Buffalo Gen. Hosp.,* 239 N. Y. 188). The question is still open whether it is liable to patients for the negligence of servants or administrative agents. The exemption from liability for the acts of surgeons or physicians arises from the nature of the enterprise or undertaking in which the hospital is engaged,

and the implications of the contract between its patients and itself. " Such a hospital undertakes, not to heal or attempt to heal through the agency of others, but merely to supply others who will heal or attempt to heal on their own responsibility " (*Matter of Bernstein* v. *Beth Israel Hosp.*, 236 N. Y. 268, 270). Physicians and surgeons " are employed by the hospital to exercise their profession and calling to the best of their abilities according to their discretion " (*Phillips* v. *Buffalo Gen. Hosp.*, p. 189, *supra*). A patient resorting to the hospital gains the benefit of facilities that would not otherwise be available. If these are furnished, he has no other remedy for the errors of surgeons or physicians, carefully selected, who have given him treatment in a ward than he would have if the same men upon the recommendation of the hospital had given him treatment at his home. By fair implication he must look to them alone (*Schloendorff* v. *Soc. of N. Y. Hosp.*, *supra*, 130, 131; *Phillips* v. *Buffalo Gen. Hosp.*, *supra; Hillyer* v. *Governors of St. Bartholomew's Hosp.*, 1909, 2 K. B. 820; *Foote* v. *Greenock Hosp.*, 1912, Session Cases, 69 [Scotland]; *Glavin* v. *Rhode Island Hosp.*, 12 R. I. 411, 424; *Basabo* v. *Salvation Army*, 35 R. I. 22; *Runyan* v. *Goodrum*, 147 Ark. 481; cf. cases collated in 23 A. L. R. 907 and 19 Mich. L. Rev. 395).

We think a hospital's immunity from liability for the errors of surgeons and physicians is matched in the case of a university by a like immunity from liability for the errors of professors or instructors or other members of its staff of teachers (*Parks* v. *Northwestern University*, 218 Ill. 381). There is indeed a duty to select them with due care. That duty fulfilled, there is none to supervise day by day the details of their teaching. The governing body of a university makes no attempt to control its professors and instructors as if they were its servants. By practice and tradition, the members of the faculty are masters, and not servants, in the conduct of the class room. They have the independence appropriate

to a company of scholars.   We may lay aside the question whether there is a duty of the governing body to control by proper rules the general plan or system for the maintenance and operation of lecture room or laboratory. We do not now determine whether such a plan or system dangerous to life or limb could be adopted by the faculty without involving the university in liability for the failure to correct it.   There is no suggestion in the evidence that the method here in vogue was ineffective in its normal operation or faulty in design.   The negligence, if any, had its origin, not in defects of plan or system, but in mistake or inattention in the doing or the omitting of something that was a detail of the work of teaching and incidental to the teaching function.   A university is not to answer in damages because false or pernicious doctrine is imparted to its students in laboratory or clinic, or because a warning of the danger of some experiment has been inadvertently omitted, or because either in performing the experiment or in supervising it, a teacher has combined the wrong ingredients or allowed them to be combined by others.   We find no adequate distinction between the negligent use of a chemical in the course of an experiment and its negligent use or handling in preparation for an experiment.   What controls is the relation of the act or omission to the proper function of the teacher and the work appropriate thereto.   The instructor who fills bottles in the laboratory or the auxiliary storeroom in making ready for assigned experiments to be presently conducted, is acting no less as an instructor than if he were doing the same thing in the course of lecture or demonstration after the class had come together. We should be confusing the limits of the immunity by distinctions incapable of application if we were to discover a dual relation in forms of conduct so united.   As well might one say that a surgeon would involve a hospital in liability if he failed, while preparing for an operation,

22

to sterilize his instruments, though he would involve himself alone if guilty of a like omission while the operation was in progress. The members of the defendant's staff of teachers were not charged with any duty in respect of the general care of chemicals held in the main storeroom as permanent sources of supply. They were professors or instructors, not curators or custodians, if the distinction be important. What they did was not to be done until the present exigencies of instruction required them to do it, and was then limited accordingly. We think the consequences of their negligence in the fulfillment of the duties incidental to the teaching function may not be charged to the defendant.

We find no evidence that any one in the service of the defendant, whether instructor or mere employee, had been carelessly selected. In saying this, we do not follow the Appellate Division in its holding that carelessness in that respect, if proved, could not result in liability. The decision chiefly relied on to justify such a holding is one by the Supreme Judicial Court of Massachusetts (*Roosen* v. *Peter Bent Brigham Hosp.*, 235 Mass. 66). Massachusetts adopts what is commonly known as the trust fund theory as the basis for the exemption from liability of charitable institutions. A remedy is there denied, not merely to the beneficiaries of the charity, but even to strangers and employees, since a fund dedicated to charity would otherwise be depleted (*Farrigan* v. *Pevear*, 193 Mass. 147). An immunity so grounded admits of no exception. In this State, however, the trust fund theory has been rejected (*Hordern* v. *Salvation Army*, 199 N. Y. 233; *Kellogg* v. *Church Charity Foundation of L. I.*, 203 N. Y. 191). With us a hospital or university owes to patients or to students whatever duty of care and diligence is attached to the relation as reasonably implicit in the nature of the undertaking and the purpose of the charity. All that is thus included is not susceptible of enumeration in advance of the event. It cannot be less, however,

than appropriate investigation of the character and capacity of the agencies of service from the highest to the lowest.   This is a duty that devolves upon the corporation itself, and one not to be shaken off by delegation or surrender (cf. *Herman* v. *Bd. of Education,* 234 N. Y. 196).   A holding to that effect has support in an overwhelming preponderance of authority.   We cite a few decisions among many that are recorded (*Taylor* v. *Flower Home & Hospital,* 104 Ohio St. 61; *Goodman* v. *Brooklyn Hebrew Orphan Asylum,* 178 App. Div. 682; *Hillyer* v. *St. Bartholomew's Hosp., supra; Foote* v. *Greenock Hosp., supra; Basabo* v. *Salvation Army, supra; McInerny* v. *St. Luke's Hosp. Assn.,* 122 Minn. 10, 15; *Hewett* v. *W. H. A. Assn.,* 73 N. H. 556, 565; *D'Amato* v. *Orange Memorial Hosp.,* [N. J.] January, 1925, 127 Atl. Rep. 340).

The plaintiff does not advance her case materially by fastening upon the defendant a duty of diligent selection. The burden is still hers to prove that the duty was disregarded.   In respect of instructors, incompetence is not asserted.   We find no evidence that the administrative employees were incompetent when their qualifications are measured by the nature of the tasks assigned to them; nor any evidence that their incompetence, if it were proved, had a causal relation to the explosion and the injuries.   All that Hagin and his son had to do was the mechanical work of pouring out a powder given to them by an instructor, and handing it to the students.   The work did not involve the smallest element of expert knowledge or discretion.   There is nothing to suggest that either of them was lacking in the requisite intelligence for acts so simple and perfunctory.

Incompetence being thus disproved, we find it needless to determine whether mere servants or employees carefully selected would charge the defendant with liability if proved to have been negligent in the performance of their duties.   Immunity, if it exists in such conditions,

would come from the recognition of what is known as the "waiver" doctrine, or something akin thereto. Dicta from our decisions may be cited for the doctrine and against it. Recent pronouncements remind us that they are dicta and nothing more. "We are reluctant to permit an affirmance of the judgment to pass as an acceptance of the theory that defendant's exemption from liability must rest on the waiver doctrine" (*Phillips* v. *Buffalo Gen. Hosp.*, 239 N. Y. 189). For present purposes we assume without deciding that the defendant is liable in like degree to students and to strangers for the negligence of servants. No evidence in the record gives support to the conclusion that there was any such default. The employees in the storeroom handed to the plaintiff the chemical selected by the teachers. There is nothing to the contrary. Only by basing a conclusion upon conjecture or suspicion could a jury reach a verdict that negligence of a servant rather than negligence of an instructor was the cause of the disaster.

In our discussion of the case we have assumed that there was fault on the part of some one in the service of the defendant, whether teacher or employee. After the happening of the accident, mercuric sulphide and potassium chlorate, and no other ingredients, were found on the plaintiff's desk. In the absence of any evidence of some defect in the mercuric sulphide, the key to the explosion would seem to be in the presence of the potassium chlorate. If the plaintiff took this out of a bottle properly labeled when she should have taken lime from another bottle, the explosion was her own fault, and so the court charged. If her recollection is accurate that she used a bottle labeled lime, then, since no lime was found upon her desk, the inference may be drawn that through the fault of an instructor the bottle was mislabeled. For some reason, the trial judge discarded this theory of negligence, and declined, with the plaintiff's acquiescence, to submit it to the jury. We may doubt

whether other negligence is chargeable to any one. For the purpose of this appeal, we assume that the plaintiff is not barred by the theory of the trial from sustaining a denial of the motion for the dismissal of the complaint upon any theory now shown to be supported by the evidence. She gains nothing from the assumption. The difficulty remains that only conjecture or suspicion can impute negligence to any one except in circumstances relieving the university of liability for the wrong of the delinquent.

The judgment should be affirmed with costs.

McLaughlin, Crane, Andrews and Lehman, JJ., concur; Hiscock, Ch. J., and Pound, J., not sitting.

Judgment affirmed.