## BRIGHAM YOUNG UNIVERSITY v. LILLYWHITE.

### No. 2167.

Circuit Court of Appeals, Tenth Circuit.

Jan. 17, 1941.

Rehearing Denied April 14, 1941.

PHILLIPS, Circuit Judge, dissenting on petition for rehearing.

———◆———

Robert L. Judd, of Salt Lake City, Utah (Paul H. Ray, S. J. Quinney, and A. H. Nebeker, all of Salt Lake City, Utah, on the brief), for appellant.

Ralph T. Stewart, of Salt Lake City, Utah (Edwin B. Cannon, of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a judgment in favor of plaintiff, now appellee, against the defendant, Brigham Young University, now appellant, for personal injuries as a result of an explosion in a chemical laboratory experiment, while the appellee was a duly and regularly enrolled student at said University.

The plaintiff charges: First, that she was inexperienced in chemistry and chemical reactions and of the materials required in performing the experiment, known as Exercise No. 11. Second, that the chemicals used in Exercise No. 11 were highly dangerous. Third, that the defendant's instructor failed to warn plaintiff of the danger in the performance of the experiment. Fourth, that defendant failed to supply proper supervision, and that the defendant was negligent in the conduct and operation of the laboratory in which the experiment was performed, in that it permitted the instructors in charge of the chemistry laboratory to leave said laboratory while plaintiff was engaged in performing the experiment.

Defendant denied it was in any way negligent in the supervision of the laboratory experiment; specifically alleging that the Chemistry Manual used by the plaintiff adequately warned of the dangers, if any, incident to the performance of the experiment and alleged affirmatively that the plaintiff was guilty of contributory negligence which proximately contributed to the injuries and that plaintiff understood the nature of the work and dangers incident thereto and assumed the risk.

As a further defense the defendant pleaded that it was a corporation, organized and existing for the purpose of conducting a public institution of learning without profit or benefit to the said corporation; that it was supported and maintained by the Church of Jesus Christ of Latter Day Saints for the sole purpose of providing public instruction and learning to its members and to the public at large, at a cost and expense greatly in excess of any tuition or fees paid by those attending said institution and particularly the plaintiff and it is therefore immune from liability for its torts.

The evidence reveals that the plaintiff, as a freshman, enrolled in a class known as Chemistry II, under the instructions of Dr. Johansen. She had completed a course in Chemistry I, devoted primarily to lectures on the elementary principles of chemistry and had commenced the study of Chemistry II. That on April 6, 1933, in company with two classmates plaintiff went to the laboratory and with permission of the instructor entered upon the performance of the exercises outlined for the day's study. The study included Exercises 10 and 11, which were the first experiments required to be performed in this course of study, the preceding experiments in the course having been devoted to the assemblage of apparatus to be used in the performance of the experiments prescribed by the course.

The manual used as the text set out fully the materials and apparatus to be used in each experiment and the steps to be followed; the purpose and results to be attained. The purpose of Exercise No. 10 was to teach the preparation of Oxygen, and among other things involved the use of metallic oxides, potassium chlorate and mangenese dioxide. Exercise No. 10 contained the following warning: "* * * Never mix anything with a chlorate unless you are instructed to do so."

Exercise No. 10 was performed under the supervision of the instructor, Dr. Johansen.

The object of Exercise No. 11 was to teach some of the properties of oxygen after they had learned the science of its preparation in Exercise No. 10 and necessitated the use, among others, of mangenese dioxide and potassium chlorate, used in Exercise No. 10, and in addition thereto required the use of red phosphorous.

At the beginning of the performance of Exercise No. 11, Dr. Johansen left the laboratory to meet an appointment with another student across the hall. There is some conflict in the evidence concerning whether or not the students were instructed to proceed with the experiment in accordance with the directions and instructions in the manual, or whether they were to set up the apparatus, secure the chemicals and equipment to be used in the experiment and to await Dr. Johansen's return.

Dr. Johansen testified that he instructed the students to read the exercises, secure the chemicals and equipment; set up the apparatus and await his return to the laboratory.

The plaintiff and another student testified that they did not recall that Dr. Johansen so instructed them and they understood that they were to proceed with the experiment in accordance with the instructions of the manual.

The evidence for the plaintiff does show that the students, including plaintiff, did read the exercise as contained in the manual, went to the storeroom, secured the chemicals and equipment required, set up the apparatus, and mixed the chemicals, supposedly in accordance with the instructions contained in the manual. There was some question among the three performing the experiment concerning whether or not they should proceed. After some hesitancy one of the girls stated: "Well it must be all

right, it is just like we follow the directions of the book." The burner was applied to the mixed chemicals and the explosion resulted.

It is definitely established that the explosion resulted from the application of the burner to the mixture of red phosphorous, potassium chlorate and ferric oxide. It is apparent therefore that the explosion was occasioned by the misuse of red phosphorous in connection with the performance of the experiment. There is no evidence that the chemicals obtained from the storeroom were mislabeled and it must be conceded that Exercise No. 10 warned of the mixture of potassium chlorate with red phosphorous and that the students read the instructions containing this warning before proceeding to perform the experiment. There were no other students engaged in the performance of Exercises 10 and 11, except the three involved in the explosion, but there was an advance class in chemistry at another part of the laboratory; no other instructor was present in the room or exercising any supervision over the class, or classes.

Over the strenuous objections of the defendant, plaintiff offered the testimony of witness Howell, an instructor in Chemistry at a high school in Salt Lake City and witness Quinn, an instructor at the University of Utah. They testified as to the method and manner employed in conducting their chemistry classes at the respective institutions and especially in regard to experiment No. 11 and the supervision given the students in connection with its performance.

Witness, Howell, testified: "during the laboratory period I never leave." He further testified that in his classes students worked in pairs and each one was given a definite assignment and that three students seldom were permitted to work together. He further stated that he used practically the same chemistry manual and when the apparatus was set up he insisted on them having the set-up "okayed" before they applied the heat and that this was done to eliminate any danger of accident.

Witness, Quinn, instructor in chemistry at the University of Utah, over objection of defendant, was permitted to explain in what manner and under what circumstances he would have performed Exercise No. 11. He testified that in his classes the students worked individually and were not permitted to work in pairs. He further testified "I have to leave the room while the experi-

ment is going on but the instructors never do." Meaning that his three assistants remained in the laboratory and circulated among the students, answering questions and watching them until they had finished the experiment. He testified further that he always explained that an explosion would result from the mixture of phosphorus and potassium chlorate, or sulphur and potassium chlorate, or carbon and potassium chlorate. Quinn further testified: "It would be quite difficult to observe as to whether or not they were using or not using the proper chemical materials as the student proceeds."

At the time the testimony of the two professors was admitted, over the objections of the defendant, the court defined the purpose for which it was admitted by stating: "I want to find out how many different ways it could be done. May be a dozen different ways it might be done. Then the question ultimately would be if your man did it a little differently from this witness or some other witness, whether this jury would say one was negligent and the other was not, or both were negligent, or both all right. If we leave anything to them at all that is all we can leave."

In his instructions to the jury, when the question was again raised, the court instructed the jury as follows: "I will reframe it, and say to the jury now, that the usual practice in other universities in respect to this or similar experiments in respect to supervision may be considered by you in determining whether or not Dr. Johansen exercised due and reasonable care in this particular instance. Such practice would not be conclusive, but it is a matter under all the circumstances of the case that you may take into consideration."

The defendant earnestly contends that the effect of the admission of this testimony was to establish a standard of care by comparison and that the negligence of the defendant cannot be established by a standard of care based upon comparison with the way some other university conducted the same experiment.

The admission of the testimony and the instruction of the court concerning the purposes for which it could be considered must be treated together. The ruling of the court, at the time the evidence was offered and admitted and the instruction given with reference thereto, defined the purpose for which it was admitted and its competency must be judged in the light thereof.

It must be conceded that evidence of the conduct of others, under the same or similar circumstances, is incompetent to establish a standard of care because standard of care is fixed by the rule of substantive law of which the court is the sole judge. Therefore, the comparative conduct of others should not be permitted to infringe upon the substantive law. The standard of care is measured by ordinary care or lack of ordinary care. Therefore, the difficulty attendant upon its admission as evidence arises in the consideration of its effect in establishing a standard of conduct as contradistinguished from its evidentiary value insofar as it is competent, together with all the other facts and circumstances submitted to the jury in the determination of the question of whether or not the conduct of the defendant in each particular case evidenced ordinary care, or the lack of it.

The question is: may the conduct of others, a plan, or system, employed by them, be considered as evidence tending to show as a fact or circumstance that the particular act or omission complained of was negligent in that an ordinary prudent person, under like or similar circumstances would have acted or not have acted in the same way? Viewed in this light, it is for the jury to accept or reject the conduct, plan or system of others in its discretion in the application of these facts to the standard of care enunciated by the court. Wigmore on Evidence, vol. 1, section 461.

If the evidence is admitted and the jury is admonished, either at the time it is admitted or by proper instruction in connection with its admission, that it was admitted merely to show what precautions were generally taken in such cases as bearing upon the degree of care enjoined upon the defendant by his relationship to the plaintiff, we think the evidence is admissible for this purpose. Pence v. California Mining Company, 27 Utah 378, 75 P. 934. To this extent it is not admitted for the purpose of showing a custom or to establish a rule of conduct by comparison.

Stated another way, it is simply an inquiry as to the ordinary manner in which such instruction is performed and from such circumstances it is for the jury to determine whether the defendant in this

case was guilty of negligence in its failure to provide adequate supervision over the work of the plaintiff. Fritz v. Western Union Telegraph Company, 25 Utah 263, 71 P. 209. It is admissible merely as some evidence of the nature of the thing in question because it indicates what is the influence of the thing on the ordinary person in that same situation. It is not to be taken as fixing a legal standard for the conduct required by law. Wigmore on Evidence, Vol. 1, paragraph 461, at page 835.

The distinction when translated into a rule is difficult of ascertainment and it is more difficult to mark with precision the limits or confines, or draw a line beyond which the court may not go in the admission of this particular class of evidence. If the introduction of the testimony would result in a confusion of issues, or inject many new controversial points collateral to the issues, or if it would tend to generate surprise, or undue prejudice disproportionate to the usefulness of the evidence, it should not be admitted.

It is generally conceded that the trial court in the exercise of its discretion is more competent to judge the exigencies of the particular case. The discretion of the trial court, when exercised within normal limits should not be disturbed. In our view, it revolves itself into essentially a practical problem and is a concession to the purely unscientific philosophy of the law.

We are of the opinion that the instruction of the court was sufficiently clear on this point and no error was committed in its admission.

Having determined that the testimony of the conduct of others in the same or similar circumstances is admissible insofar as it tends to prove the negligence of the defendant, it is for us to consider whether or not the plaintiff has sustained the burden of proving the negligence of the defendant which proximately contributed to her injury. It is significant at this point to consider the interrogatories submitted to the jury; the answer to which form the basis of its verdict. These interrogatories must be considered in the light of the legal duty which the defendant owed to plaintiff.

The defendant undertook to instruct the plaintiff in a course of study, which involved the performance of certain experiments; that they were hazardous and dangerous to one not learned in the science of their performance is evidenced by the result. That the plaintiff was not learned is inherent in her status as a student. Therefore, it became the duty of the defendant to furnish instruction and supervision, and that degree of supervision is measured in quality by what an ordinary institution of this type would have furnished under the same or similar circumstances.

The jury was asked to determine, from the conflicting testimony, whether or not Dr. Johansen instructed the plaintiff and others engaged in the same experiment to proceed with the experiment, or to await his return to the laboratory. The jury found upon a direct interrogatory that Dr. Johansen did not instruct the students to await his return. It then became a question of fact whether or not, under all the circumstances, the defendant was negligent because Dr. Johansen left the laboratory under the prevailing circumstances. The jury answered this question in the affirmative. The jury further found in effect that Dr. Johansen instructed the plaintiff and others to proceed to perform a dangerous experiment, without supervision, in that he failed to use reasonable and ordinary care in supervising the performance of the experiment.

To be sure, there is evidence from which the jury would have been warranted in finding the plaintiff guilty of contributory negligence proximately causing the injury. This question was fairly submitted to the jury by the interrogatories. The jury was asked to decide if the negligent act of plaintiff in working with her companions in mixing the wrong chemicals proximately contributed to the explosion. The answer was no. The jury did find in answer to an interrogatory that the plaintiff, or those jointly engaged in the performance of the experiment negligently made the mistake of mixing the chemicals and that such mistake proximately caused the explosion but that the plaintiff was not negligent in failing to prevent the mixing of the red phosphorous and potassium chlorate. Although there appears to be some inconsistency in the answer made to the interrogatories the jury did find in answer to an interrogatory that assuming a mistake was made in mixing red phosphorous and potassium chlorate, that such mistake was caused by the failure of Dr. Johansen to use reasonable and ordinary care in supervising the performance of the experiment, which in ef-

fect reaches the conclusion that those performing the experiment, including plaintiff, did make a mistake and that the mistake proximately caused the explosion but the failure of the defendant to properly supervise, proximately caused the mistake.

Thus, the interrogatories submitted in connection with the instructions of the court, defined the rule which governs the conduct of the defendant in these circumstances. The answers to the interrogatories brought the plaintiff within the realm of the protection afforded by the rule.[1] The rule thus established required the defendant not only to remain in the laboratory during the performance of the experiment but to exercise ordinary care in the supervision of it. The verdict of the jury, based upon its answers to the interrogatories and in accordance with the instructions of the court, in effect said that the defendant violated that duty when he left the laboratory with the implied instruction to perform the dangerous experiment during his absence, and was therefore guilty of negligence.

The issue of whether or not the injuries to the plaintiff resulted from an independent and intervening cause, unrelated to the negligence of the defendant, and the direct question of whether or not the negligence of the defendant was the proximate cause of the injuries to the plaintiff, were submitted to the jury and answered favorably to the plaintiff.

Without more, it is manifest that the negligent conduct of the defendant was the legal cause of the harm sustained by the plaintiff.[2]

■■■ The defendant also assigns as error the refusal of the court to instruct the jury on joint enterprise, contending in effect that the three girls, engaged in the performance of the experiment, entered upon a joint venture and if the injury resulted from the negligence of either one of them the plaintiff could not recover. Although we think the request was properly met by the court's instruction on "Intervening Cause," it is enough to say that the relationship of these students did not possess any of the essential ingredients of a joint enterprise. Here each of the students separately and independently entered the defendant University; they were each separately and independently pursuing a course of study therein and their relationship as classmates in a common course of study, under the direction of the University, could not in any sense constitute a joint enterprise.

■■■ The instructions of the court, in our opinion, substantially and correctly stated the rule which governs the questions involved. The refusal of the court to submit other instructions requested by the defendant was not error.

■■■ We are asked to hold that the defendant University is not liable for the actions of Dr. Johansen because he is an instructor and to this extent apply the rule made applicable to charitable institutions in many jurisdictions; the philosophy of which is clearly and succinctly enunciated in Hamburger v. Cornell University, 240 N.Y. 328, 148 N.E. 539, 42 A.L.R. 955, and Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, 52 L.R.A.,N.S., 505, Ann.Cas.1915C, 581.

We have carefully considered the cases which influence the law of the state of Utah on this question, including Henderson v. Twin Falls County, 56 Idaho 124, 50 P. 2d 597, 101 A.L.R. 1151; Sessions v. Thomas D. Dee Memorial Hospital Association, 94 Utah 460, 78 P.2d 645, and Wilcox v. Idaho Falls Latter Day Saints Hospital, 59 Idaho 350, 82 P.2d 849. In our view, it would serve no useful purpose to consider for ourselves the various situations which condition the tort liability of a charitable institution not operating for profit, in the light of the established law of many other jurisdictions. It is enough to say that in our opinion the Supreme Court of Utah, after much difficulty and contrariety of opinion has definitely and conclusively for the present repudiated the doctrine of immunity generally accorded charitable institutions not operating for profit, especially if the tort be against a paid patient, or in this instance, a student. Under the rule announced in the Session case, supra, no exceptions or immunities

---

[1] Rationale of Proximate Cause by Green, page 69 "The court must determine whether the hazard to which a plaintiff has been subjected falls within the range of the protection of the rule invoked by him."

[2] Restatement of the Law on Torts, § 431.

are granted to organizations of this character.[3]

The general rules of agency and tort liability are applicable in this case. It is not disputed that Dr. Johansen was a paid instructor of the defendant University and that he was acting in the scope of his duties as such at the time of the accident complained of.

The judgment of the trial court is affirmed.

## On Petition for Rehearing.

Rehearing denied.

PHILLIPS, Circuit Judge (dissenting).

Mrs. Edith C. Lillywhite[1] brought this action against Brigham Young University[2] to recover damages for personal injuries.

The University is a nonprofit corporation. Its object, as set forth in its articles of incorporation, is to establish and maintain a college of learning. It was established in 1875 by the late Brigham Young, then president of the Church of Jesus Christ of Latter-day Saints, by a deed of trust to provide educational opportunities to members of the Church. In 1896 it was incorporated by the Church and has since been maintained by donations and gifts from the Church and others, and from tuitions received from students. It has no capital stock. The average annual attendance from 1929 to 1939 was 2300 students. From July, 1896, to June, 1939, the Church appropriated for maintenance of the University, $5,884,272.32. In the year 1938–1939, the value of the educational plant was as follows: land and buildings, $1,031,950.56, equipment, $358,082.62. In the year 1938–1939, the University received from the Church, $310,000, from endowment fund income, $4,971.34, and from tuitions, $152,032.91. Thus, it will be seen that the plant and equipment were provided with funds derived from charitable gifts and that the operating costs paid from funds derived from charitable gifts are substantially greater than the revenues derived from students' tuition. The operating cost per student to the University is $175 per year. The tuition per student is $75 per year. The University accepts widows' daughters at part tuition and grants scholarships to worthy students.

At the time of the accident the plaintiff was 18 years of age and a duly enrolled student at the University. During the spring quarter of 1933 she took a course, known as Chemistry II, which included laboratory experimentation. The accident occurred while plaintiff, Afton Kay Anderson, and Lucy Rice were jointly engaged in performing experiment No. 11 of Chemistry II. In the fall quarter of 1932 plaintiff had taken a course, known as Chemistry I, in which the instructor gave lectures and conducted experiments. During that course the instructor had demonstrated experiment No. 11 and warned the students against the explosive hazard connected with the use of potassium chlorate and against the promiscuous mixing of ingredients without knowledge of their nature.

The manual, pursuant to which the students were conducting experiment No. 11, called for the mixture of either manganese dioxide or ferric oxide with potassium chlorate. It also called for the use of sulphur and red phosphorus to test for oxygen. It gave detailed directions as to each step to be taken by the student in carrying out the experiment. Chemistry II was taught by Dr. Johansen. On the day of the accident, plaintiff and her fellow students had completed experiment No. 10 which demonstrated the preparation of oxygen from oxides, peroxides, and chlorates. The text of the manual covering ex-

---

[3] In the Session case, supra [94 Utah 460, 78 P.2d 653], the writer of the majority opinion concluded: "* * * A charity is held not to be immune for negligence of its servants, even when that institution is conducted by an arm of the state under powers granted to do so."

One Justice, specially concurring, stated: "I think the doctrine of respondeat superior should apply."

One Justice dissenting, stated: "My understanding of the majority decision is that the defendant hospital is held liable for any negligence of its nurses where the injured patient is a so-called paying patient, irrespective of the character of the institution, whether a charitable or eleemosynary hospital or one operated for profit. * * * If this be the correct analysis of the decision, then it is wholly unnecessary to determine whether defendant is a charitable institution or one organized and operated for profit since the rule of liability will be the same in either event."

[1] Hereinafter referred to as plaintiff.

[2] Hereinafter referred to as the University.

844

periment No. 10 contained the following caution: "Sodium or potassium chlorate mixed with a combustible material form an explosive mixture which may be set off by slight friction. Never mix anything with a chlorate unless you are instructed to do so." After completing experiment No. 10, the plaintiff and her fellow students obtained the materials from the stock room for experiment No. 11. The materials were obtained in test tubes or beakers and were labeled by the plaintiff and her fellow students with slips of paper as they were handed to them by the person in charge of the stock room. The evidence established that the proper materials were furnished. Plaintiff and her fellow students set up their apparatus and proceeded with experiment No. 11. In so doing, they inadvertently mixed potassium chlorate with red phosphorus instead of with ferric oxide or manganese dioxide. They then applied a Bunsen burner and the mixture exploded causing the injuries to the plaintiff.

There was testimony that Dr. Johansen directed the students to obtain their equipment and set up the apparatus, told them he had to leave the room but would return and inspect their apparatus and equipment, and directed them to wait until he had returned and made the inspection. Mrs. Anderson testified that she did not remember Dr. Johansen's instruction not to proceed until he had checked the apparatus. The plaintiff testified to the same effect.

Harvey Howell, an instructor in chemistry at the East High School in Salt Lake City, testified, over objection of counsel for the University, that in giving the course in Chemistry II at the High School he placed a large poster in the front of the classroom from which the students could carefully check their setup; that he insisted upon the setup being checked by him before the heat was applied; that he also used a direction sheet which stated "Check that setup. Get an okeh," and that he never left the room during the laboratory period.

Elton L. Quinn, a professor of chemistry at the University of Utah, who had also taught at Princeton University and New Mexico State School of Mines, testified, over objection of counsel for the University, that in giving the course in Chemistry II, he always warned the class against the explosive danger of mixing potassium chlorate and phosphorus, potassium chlorate and sulphur, and potassium chlorate and carbon; that he and his assistants, two

or three in number, circulated among the class to see that they set up the apparatus as directed; and that the laboratory was never open during the absence of instructors or supervisors.

Neither Mr. Howell nor Mr. Quinn testified that it was the duty or practice of the professor to supervise the mixing of the materials.

Howell testified:

"As far as the mixing of the chemicals are concerned inside it would be absurd to think of my checking that. I have to depend on the fact that they do pay attention to what is given them in the manual and what I have instructed them with regard to the course and their own good judgment."

Quinn testified:

"It would be quite difficult to observe as to whether or not they were using or not using the proper chemical materials as the student proceeds."

Mrs. Anderson testified that Dr. Johansen had told them to read the instructions and had discussed the directions with them. The plaintiff testified that Dr. Johansen discussed the general directions with the students. Dr. Johansen testified that he told them to read the directions very thoroughly and often and to follow them carefully.

After plaintiff and her fellow students secured the materials and had set up the apparatus and had mixed the materials and were ready to apply the Bunsen burner, Mrs. Anderson was hesitant about applying the burner. She testified that one or both of the other girls urged her to go ahead. She then applied the burner and the explosion occurred.

The basis of negligence alleged in the complaint was the alleged failure of Dr. Johansen to warn against the dangers in mixing potassium chlorate with red phosphorus or other explosive materials and the alleged failure of Dr. Johansen to properly supervise the carrying out of the experiment.

At the close of all the evidence, the University moved the court for a directed verdict in its favor on the grounds that the University was a charitable institution and not liable for the negligence, if any, of Dr. Johansen; that the plaintiff had failed to prove any negligence on the part of Dr. Johansen that proximately caused the injury; that the injury was caused by the

negligence of plaintiff and her fellow students; and that plaintiff and her fellow students were guilty of negligence which proximately contributed to her injury. The trial court denied the motion.

The court instructed the jury:

" * * * that the usual practice in other universities in respect to this or similar experiments in respect to supervision may be considered by you in determining whether or not Dr. Johansen exercised due and reasonable care in this particular instance. Such practice would not be conclusive, but it is a matter under all the circumstances of the case that you may take into consideration."

In answer to special interrogatories, the jury found that plaintiff and her fellow students negligently made the mistake of mixing the wrong chemicals, and that the mistake was the result of the failure of Dr. Johansen to supervise the students in the performing of experiment No. 11, and that plaintiff was not negligent in failing to observe and prevent the mixing of red phosphorus with potassium chlorate.

The jury returned a general verdict in favor of the plaintiff. The Unversity interposed a motion for judgment, notwithstanding the verdict, which was denied. From the judgment entered thereon, the University has appealed.

The evidence established that plaintiff was warned during the course in Chemistry I respecting the explosive hazard of potassium chlorate; that the directions respecting experiment No. 10 contained a specific warning against such danger, and that Dr. Johansen instructed the students to read the instructions carefully and thoroughly and to carefully follow them. It seems to me, therefore, that the case turns upon whether Dr. Johansen was negligent in not supervising the experiment, and whether such negligence was the proximate cause of the injury. The testimony adduced in behalf of plaintiff showed that it was the practice in two other institutions to check the setup before the student proceeded with the experiment, but that it was practically impossible to supervise and check the mixing of materials. The accident here was not caused by any error in the setting up of the apparatus, but was due, as the jury found, to a mistake in mixing the materials. The evidence adduced by plaintiff established that the instructor could not supervise the mixing of materials. A finding that supervision would have prevented the mistake in mixing materials would have been based on mere conjecture. I, therefore, conclude that if Dr. Johansen was negligent in failing to supervise the students, such negligence was not the proximate cause of the injuries to plaintiff.

It is also my opinion that the court erred in giving the quoted instruction. There was no evidence of the usual practice in other universities. Testimony as to the practice followed at the East High School and the University of Utah did not establish a customary or standardized practice in other universities.

Under the law of Utah, whether a charitable institution is exempt from liability for the negligent acts of its officers, employees, and servants depends upon whether the cost of the service which it renders so preponderates the charge made therefor as to justify the conclusion that it is performing a pure charity.

In Sessions v. Thomas Dee Memorial Hospital Ass'n, 89 Utah 222, 51 P.2d 229, 232, the court said:

"There are other cases where the character of the institution is a question for determination. When the character of the institution has been, from the evidence or from the pleadings if they are sufficient, determined to be charitable, then the rule of exemption from liability for tort of its servants and from taxes is generally applied. * * *

"The fact that an association is organized with or without capital stock is a matter of proof, and as such may weigh for or against its claimed charitable character. So may the matter of whether the institution exacts payment for all patients, or only a part of them, or none of them. So may the manner and amount of profits or accumulations, if any, and the purposes and manner of distribution or use thereof, whether the institution may be privately owned and the nature of that ownership and use, the activity engaged in—all are matters of evidence. The use or service to which the institution devotes its property, and the ultimate ends to be attained, may be important for consideration. Thus, certain of the properties of an organization generally recognized as charitable may be devoted to the production of income or profit the same as a private corporation organized for profit. Such property may not

be exempted from taxation because the purpose of the association or society is that of a charitable institution. What the evidence establishes characterizes the institution. Its character is for determination from the evidence by the court or by the jury under proper instruction by the court. * * *

"As was said in the case of Gitzhoffen v. Sisters of Holy Cross Hospital Ass'n [32 Utah 46, 88 P. 691, 695, 8 L.R.A.,N.S., 1161]:

" 'The fact that the corporation was formed for the purpose of maintaining and conducting hospitals for the treatment of the sick, wounded, and injured persons, and for the care of the infirm, is not controlling, for such things may be done for profit as well as for charity.' * * *

" 'A charity is a gift to the general public use which extends to the rich as well as to the poor. The test of a charity and the test of a charitable organization are in law the same. The principal and distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits, but derives its funds mainly from public and private charity, and holds them in trust for the objects and purposes expressed in its charter.' "

On the second appeal of the case, Sessions v. Thomas D. Dee Memorial Hospital Ass'n, 94 Utah, 460, 78 P.2d 645, 650, it appeared that the Memorial Hospital in the year 1932 rendered charitable services amounting to $13,913.87 and its income was $171,814.38; that in the year 1933 it rendered charitable services amounting to $10,712.53 and its income was $172,018.30; that in the year 1934 it rendered charitable services amounting to $9,013.94 and its income was $201,059.07; that in the year 1935 it rendered charitable services amounting to $10,349.70 and its income was $207,467.49; that patients who were able to pay were charged standard rates; that the hospital derived a profit from its operations, but expended such profits for enlarging and improving its plant; and that plaintiff was received as a patient for pay at standard rates. The court held under those facts that the hospital was not immune from liability for the negligent acts of its servants, agents, and employees. In the opinion the court said:

" 'Once it is established, the institution, society, association, or corporation is char-itable, and so, pursuing its purpose, the law of immunity seems to be settled. The question here submitted is: Does the contract for "pay" take the institution out of the protection of the rule, or, in so far as the contract for pay is concerned, make the institution a business institution not subject to the charitable immunity?' * * *

" 'Whether or not that character attaches, it seems to us, is a matter of proof under all the circumstances of the case.' * * *

"Put otherwise, where a contract involves an agreement to perform a service for compensation or pay, although the general purposes of the actor may be charitable, yet, in the particular instance the general character or purposes of the actor may not without more be invoked as a defense as a matter of law, whether pleaded in the complaint or by way of answer or defense. There are instances where a given agreement may partake so largely of compensatory or profit-taking elements as to remove the activity from the charitable field. Instances will readily occur, one of which may be where the services are critical but comparatively simple; and a compensation beyond a reasonable one for either service, technical skill, or responsibility, and the profits are considerable yet not a gift. There are combinations where the contract for service so preponderates as to justify the conclusion that the actor was performing a pure charity."

Here, the University was organized in 1896 as a nonprofit charitable corporation. It has no capital stock. Its articles of incorporation make no provision for profits and it derives no profits from its operations. Its funds are mainly derived from charitable gifts and it holds and uses them exclusively for charitable purposes. While it charges the student a tuition of $75 a year, its educational plant was established with charitable gifts, and of its operating cost per student $100 is derived from charitable gifts and only $75 from tuition. When consideration is given to these facts, I think it must be said that the cost and value of the educational service rendered so preponderate the tuition charge as to justify the conclusion that the actor is performing a pure charity, and is immune from liability for the negligence of its employees.

It is my opinion that the court erred in denying the motion for a directed verdict and for judgment, notwithstanding the verdict, and that the judgment below should

be reversed, and I, therefore, respectfully dissent from the order denying the petition for rehearing.