## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## YESHIVA UNIVERSITY, Respondent,

and

## Yeshiva University Faculty Association, Intervenor.

### No. 852, Docket 77–4182.

United States Court of Appeals, Second Circuit.

Argued April 26, 1978.

Decided July 31, 1978.

---

Howard E. Perlstein, Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C.), for petitioner.

Saul G. Kramer, New York City (Proskauer, Rose, Goetz & Mendelsohn, New York City, Peter G. Samuels, Gerald A. Bodner, New York City, Labor Counsel to respondent), for respondent.

Ronald H. Shechtman, New York City (Gordon & Shechtman, Murray A. Gordon, New York City, of counsel), for intervenor.

Matthew W. Finkin, Duke University, Durham, N. C., David E. Feller, University of California, Berkeley, Cal., of counsel, for amicus curiae American Association of University Professors.

Richard Semeraro, New York City, for New York University; Jerome Medalie, Boston, Mass. (Widett, Widett, Slater & Goldman, Boston, Mass.), for Northeastern University; Ronald DeMaria, Newark, N. J. (Lum, Biunno & Tompkins, Newark, N. J.), for Fairleigh Dickinson University; Alan Miller, Boston, Mass. (Stoneman, Chandler & Miller, Boston, Mass.), for Boston University; Nicholas DiGiovanni, Jr., Boston, Mass. (Morgan, Brown, Kearns & Joy, Boston, Mass.), for University of Vermont; Daniel Riesel, New York City (Winer, Neuburger & Sive, New York City), of counsel, for amici curiae.

Lawrence A. Poltrock, Chicago, Ill., Michael Radzilowsky, Chicago, Ill., of counsel, for American Federation of Teachers, AFL–CIO, amicus curiae.

Before LUMBARD, MULLIGAN and TIMBERS, Circuit Judges.

MULLIGAN, Circuit Judge:

The National Labor Relations Board (the Board) has applied for enforcement of its order of August 24, 1977, reported at 231 NLRB No. 98, requiring respondent Yeshiva University (Yeshiva) to recognize the Yeshiva University Faculty Association (the Union) as the exclusive bargaining agent of a unit of Yeshiva's full-time faculty members. The petition for enforcement of the Board's order is denied.

I

On October 30, 1974 the Union filed a petition under § 9(e) of the National Labor Relations Act (the Act), as amended, 29 U.S.C. § 159(e), for certification of a bargaining unit consisting of full-time faculty at Yeshiva University.[1] In opposition Yeshiva contended that all its faculty members

1. The Union did not seek to include within the proposed unit the faculty of several schools and affiliates of the University: the Albert Einstein College of Medicine, the Sue Golding Graduate School of Medical Sciences, Yeshiva High School, the Benjamin Cardozo School of Law, and several theological and community programs. The University did not contest the exclusion from the unit of these faculty members. Accordingly, the above divisions of Yeshiva are not here involved and all references to Yeshiva University exclude these schools and programs.

Other faculty excluded from the unit sought by the Union and approved by the Board were part-time faculty; lecturers; Deans, acting deans and Directors; faculty whose initial and subsequent appointment is subject to special funding derived in the main from non-University funds or whose initial or subsequent appointment is in connection with special projects; the Registrar; visiting professors (with effective faculty appointments at other academic institutions); librarians; research assistants; research associates; emeritus faculty not actively engaged in teaching at the University; officers of the University; all other administrative and support personnel; guards, and supervisors as defined in the Act.

are managerial or supervisory personnel and hence not employees within the meaning of the Act. Alternatively, the University sought a unit consisting of all full-time and regular part-time faculty with certain exclusions for managerial or supervisory personnel. Between November 26, 1974 and May 6, 1975 hearings were conducted before a Board-appointed hearing officer. On December 5, 1975 the Board issued its decision and direction of election, reported at 221 N.L.R.B. 1053.

The Board found that the Union was a labor organization within the meaning of the Act and that University faculty were professional employees and not managerial or supervisory personnel. The Board further found that department chairmen, assistant deans, and faculty members of certain committees with University-wide jurisdiction were neither managerial nor supervisory personnel. The Board concluded that a unit of full-time faculty was an appropriate bargaining unit.[2]

In the election held pursuant to the Board's direction between December 16 and 20, 1976 the Union won by a substantial margin. On December 29, 1976 the Union was certified as the exclusive bargaining representative of the employees in the unit.

Yeshiva, however, refused to bargain with the Union and on February 2, 1977 the Board issued a complaint against the University under charges filed by the Union. Yeshiva opposed the complaint and a subsequent motion for summary judgment, again raising objections to the propriety of the NLRB's unit determination.

The University's position was rejected by the Board, which found Yeshiva to be acting in violation of §§ 8(a)(5) and (a)(1) of the Act, as amended, 29 U.S.C. §§ 158(a)(5), (a)(1). The Board granted summary judgment against Yeshiva and ordered the respondent to bargain collectively with the Union. This proceeding was commenced by the Board on October 17, 1977 following Yeshiva's continued refusal to comply with its decision and order.

On this appeal, Yeshiva argues principally, as it did before the Board, that the full-time faculty of the University are managerial and/or supervisory employees within the meaning of the Act and are therefore excluded from the Act's coverage. Yeshiva also urges that two assistant deans and faculty who are departmental or divisional chairmen, or who are members of certain committees on University affairs, exercise additional authority which mandates their classification as supervisors and/or managers.[3] Before examining these contentions it is necessary to review the structure of Yeshiva and the role played by the faculty in the operation and governance of the University.

## II

Yeshiva University is a private institution of higher education chartered under the laws of the State of New York. Its offices and educational facilities are located on four widely separated campuses in New York City. We are here concerned with Yeshiva's six undergraduate colleges and

2. The unit approved by the Board included full-time faculty with the titles of professor, associate professor, assistant professor, instructor, or any adjunct or visiting faculty member with such rank, department chairmen, division chairmen, senior faculty and assistant deans. The Board also found that "terminal" faculty members, i. e., those who at the date of the election had received notice of termination or non-renewal of appointment, had reached the mandatory retirement age or had given notice

of intention to resign, were eligible to vote if still employed at the date of the election.

Thus the unit sought by the Union was found appropriate with one minor exception: faculty members administering grants under awards by Government or private agencies were excluded from the unit as supervisors under the Act.

3. Yeshiva also argues that the Board abused its discretion by excluding part-time faculty from

programs,[4] and four graduate schools.[5] Approximately 2,500 full and part-time students are enrolled at Yeshiva. The University is staffed by 209 full-time and 150 part-time faculty members.[6]

Yeshiva has a self-perpetuating Board of Trustees with no administrative position at the school apart from their membership on the Board. The University's chief executive officer is the President. There are, in addition, three vice-presidents at Yeshiva (for student affairs, business affairs, academic affairs) as well as a Bursar, Registrar, Director of Admissions and several University deans. An Executive Council of deans and administrators makes recommendations to the President with respect to various matters. Two other committees, the Council of Graduate Schools and the Council of Undergraduate Schools advise the President and Board regarding inter-divisional programs designed to increase coordination and cooperation among the schools and divisions of the University. These councils consist of elected student and faculty representatives from each school or division, the dean or director of each academic unit and members of the University administration, including the President. A Faculty Handbook sets forth University policies regarding faculty appointments, promotion, tenure, termination and sabbaticals.

Each of the schools or divisions is headed by a dean or director. Most of the schools

have a faculty assembly or student-faculty senate as well as a committee structure, including, *inter alia,* a curriculum committee, a standards committee, and a welfare committee. The faculty of each school meet periodically and at Stern College, Yeshiva College, and the Belfer and Ferkauf Graduate Schools the faculties meet and conduct their affairs according to written by-laws and/or constitutions which have been approved by the President. Only two of the schools, Yeshiva College and the Belfer Graduate School, have assistant deans. These two assistant deans are teaching faculty members.

Each school, college and program at Yeshiva enjoys great autonomy in determining its own curriculum, grading system, and academic standards as well as in a wide variety of other matters. Therefore the role of the faculty at Yeshiva can best be appreciated by a review of the individual academic units of the University.

### 1. *Stern College for Women*

At Stern College a Committee on Academic Standards, composed of the Dean of the College, Dean Mirsky, who retains his faculty rank, and six full-time faculty, fixes the academic requirements and decides whether a student whose performance is inadequate will be required to leave the school. Although Dean Mirsky recognizes that the decision to dismiss a student results in a loss of tuition income, he has

the unit, and permitting terminal faculty members to vote in the election.

4. The undergraduate units of Yeshiva are Yeshiva College, Stern College for Women, The Teacher's Institute for Women, The Erna Michael College of Hebraic Studies (Erna Michael College), James Striar School of General Jewish Studies (James Striar School) and the Yeshiva Program.

5. The graduate schools are: Bernard Revel Graduate School, and its summer division, Harry Fischel School of Higher Jewish Studies (Bernard Revel School), Wurzweiler School of Social Work (Wurzweiler School), Ferkauf Graduate School of Humanities and Social Sciences (Ferkauf Graduate School) and Belfer Graduate School of Sciences (Belfer Graduate School).

6. Below is a numerical breakdown of the faculty members at Yeshiva's ten schools and programs:

UNDERGRADUATE SCHOOLS

| | Full-Time Faculty | Part-Time Faculty |
|---|---|---|
| Yeshiva College | 47 | 42 |
| Stern College | 38 | 33 |
| Teacher's Institute for Women | 4 | 7 |
| *Jewish Studies Programs* | | |
| James Striar School | 6 | 8 |
| Erna Michael College | 13 | 8 |
| Yeshiva Program | 10 | 2 |
| Undergraduate School Subtotals: | 118 | 100 |
| GRADUATE SCHOOLS | | |
| Belfer Graduate School | 38 | 3 |
| Ferkauf Graduate School | 32 | 23 |
| Wurzweiler Graduate School | 18 | 14 |
| Bernard Revel Graduate School | 3 | 10 |
| Graduate School Subtotals: | 91 | 50 |
| TOTALS: | 209 | 150 |

never overruled the Committee. Similar committees composed predominantly of faculty members establish admission standards, determine graduation requirements, and set up grading systems. Upon the recommendation of a scheduling committee the faculty introduced a new scheduling model for the school. In response to growing budgetary limitations, a faculty committee on personnel and budget has made generally effective recommendations concerning elimination of elective courses, the establishment of joint courses, and other scheduling changes. In the 1969–70 academic year the Stern College faculty disagreed with a decision by Dean Mirsky and the Curriculum Committee to delete Stern's education major; Mirsky reinstituted the major. Indeed, a faculty dominated curriculum committee must pass on all program changes or changes in graduation requirements.

Department chairmen call to Mirsky's attention the need for new faculty members. Interviewing is done by the chairman and the Dean who then agree on an appointment. Dean Mirsky has never made a faculty appointment which was not approved by a department chairman. Similarly effective recommendations are made by department chairmen regarding termination of faculty members. Mirsky has only once disagreed with a department chairman with respect to a termination.

Promotion recommendations are solicited from department chairmen by a faculty Promotions Committee. The committee passes on its recommendation to Mirsky who has always accepted the committee's decisions. The University President has granted the great majority of recommended promotions and has never overruled a negative recommendation.

Tenure recommendations are made both by Mirsky and the candidate's department chairman to the University President. All negative tenure recommendations by chairmen have been accepted both by Mirsky and by the administration. In only one instance has Mirsky disagreed with a chairman's positive tenure recommendation. Nevertheless, tenure was granted on that occasion.

## 2. Yeshiva College

At Yeshiva College a College Senate composed of faculty, administrators, students and alumni members has jurisdiction over admissions policy, scholastic standards, the grading system and other academic policy matters. All measures passed by the Senate are subject to veto by the Faculty Assembly. The Dean of the College, Dean Bacon, who is also a professor of linguistics, testified that he feels compelled to see that decisions of the Senate and Assembly are executed. Moreover, not once in Bacon's sixteen years as Dean has the University President vetoed an action by either body. Bacon is aided by an assistant dean who teaches one course per semester.

Yeshiva College is divided into "subject areas" which are the equivalent of departments in other schools. The counterpart of the department chairman at Yeshiva College is the senior professor in the subject area. Subject areas are grouped into four broad divisions. One senior professor in each division serves as a "divisional chairman."

The divisional chairmen comprise the Advisory Council on Promotions. Recommendations on promotions by the Council have always been followed by the President of the University, although such recommendations have, at times, been in conflict with those made by Dean Bacon.

Senior professors screen applicants for faculty positions. Dean Bacon and the senior professor then jointly make the hiring decisions with Bacon generally accepting the recommendations of the senior professor. Indeed, the Dean has never appointed a faculty member over the objection of a senior professor and once sustained a senior professor's objection over the appointment desired by a University Vice-President for Academic Affairs. Dean Bacon has given equal deference to the recommendations of senior professors regarding termination and reappointment of probationary faculty. Finally, senior professors largely determine the budget of their subject area. The

budget requests of the senior professors receive perfunctory approval by Bacon "99 percent" of the time and during Bacon's tenure had never been rejected by the University administration.

### 3. *Erna Michael College*

At Erna Michael College, admissions procedure, curricular matters, grading, scheduling and other questions of academic policy are subjects on which the faculty, through the faculty meeting, governs. The faculty has also implemented a basic restructuring of the College in which the number of academic hours required of students was substantially reduced. As a result, faculty at the College now teach fewer hours and teach a minimum of only three rather than four days per week. Dean Rabinowitz of Erna Michael testified that he felt bound to institute even those faculty decisions with which he disagreed, such as the establishment of a trimester academic calendar. Neither Dean Rabinowitz nor any other member of the administration has ever vetoed a decision of the faculty on such issues.

Evaluation of faculty to determine whether retention or salary increase is warranted is often carried out at a meeting of faculty in the affected member's academic subject area and is led by the senior professor who, as at Yeshiva College, is the equivalent of a department chairman. At other times such evaluations are simply made by the senior professor. The role of the senior professors at Erna Michael regarding promotion and termination of faculty is very similar to that at Yeshiva College.

### 4. *The Teacher's Institute for Women*

The Director of the Teacher's Institute, Rabbi Faivelson, testified that the faculty had made effective recommendations regarding curriculum, admissions policy and degree requirements.

When the need for a new faculty member arises Rabbi Faivelson asks the faculty[7]

whether they have any objections to the applicants. Faivelson stated that if any faculty member has the slightest objection the applicant is not hired. On an occasion where Faivelson favored termination of a faculty member for budgetary reasons the faculty voted against the termination and the faculty member was retained.

Rabbi Faivelson once recommended that the Institute move to Brooklyn to attract better students. The faculty rejected the proposal and determined that the school would remain in Manhattan.

### 5. *James Striar School*

Director of James Striar, Rabbi Besdin, who carries a full-time teaching load, testified that faculty meetings are "in a great sense decisive as to the direction of the school." The faculty at James Striar have considered at their meetings administrative regulations, curriculum matters, and course offerings. Rabbi Besdin testified that he did not recall ever overruling a direct recommendation of the faculty. Indeed, he stated that on one occasion a majority of the faculty rejected his recommendation to retain a student guidance procedure, thereby "overruling" Besdin on the issue.

Part-time faculty hiring decisions are made by Besdin and the affected department chairman. Besdin has never hired a full-time faculty member without consulting the concerned department head.

### 6. *The Yeshiva Program*

Rabbi Charlop is the Director of the Yeshiva Program, which provides a course of study in Talmudic texts. There are no traditional faculty ranks at the Yeshiva Program. Rabbi Charlop testified that decisions affecting academic matters are made by a consensus of the faculty. In one instance the faculty decided to extend the academic calendar by two weeks and this decision was implemented.

---

7. There are no faculty ranks at the Institute. Thus, there are no department chairmen or senior professors.

### 7. Belfer Graduate School

Arthur Komar became Belfer's Dean in 1968 after the school's faculty successfully petitioned the President of the University for the removal of Komar's predecessor. Thereafter, Komar was elected Acting Dean by the faculty and he obtained a vote of approval from the faculty before accepting a permanent appointment as Dean. Komar, who was teaching one course at Belfer when he testified, stated that he viewed his position as Dean as "first among equals." Komar's assistant dean is a tenured assistant professor who teaches one course each semester.

At Belfer a Faculty Council deals with curricular problems, size of departments and formation of new departments. It has even discussed the financial and wage policies of the school. The majority of the key decisions in the governance of Belfer, however, are made by the school's departments. The hiring of faculty members and the length of their appointments are determined by a majority vote of the department. Dean Komar testified that his only role in hiring is his participation—like any other faculty member—in the discussion and voting on applicants to his department. Decisions on promotion, tenure and nonrenewal of faculty appointments are also made within each department by consensus. Komar stated that he does not believe he has the right to override such departmental decisions. Salary negotiations with new faculty are arrived at not by Komar but by department chairmen. The chairman's recommendations for salary figures are generally accepted by the Dean.

### 8. Ferkauf Graduate School

As at Belfer, faculty hiring decisions at Ferkauf are effectively made by consensus of the department. The Dean of Ferkauf, Dean Gittler, last taught a course in the semester prior to his testimony. He stated that he accepts "98 percent" of faculty appointments recommended by the departments and the administration has never vetoed an appointment. Rank of appointees (and thus their salary) is also decided by the department.

Many other aspects of the school's operation are resolved by faculty committees. The Promotions Committee effectively determines questions of faculty promotions. In fact, a promotion has never been made in the face of a negative committee decision and only once in the past nine years has a positive committee recommendation not resulted in the faculty member's promotion.

Tenure questions are handled by the Faculty Council on Tenure. Neither Dean Gittler nor the administration has ever reversed a negative tenure decision of the Council. Only once has a positive recommendation not resulted in a grant of tenure.

Department chairmen at Ferkauf wield substantial budgetary power through the Chairmen's Council. Until the budget cutbacks of the last few years every aspect of the budget was deliberated by the Council. Similarly, tuition increases are never recommended by Dean Gittler unless the chairmen concur. Chairmen also establish, in consultation with their departments, the workload of the full-time faculty.

### 9. Wurzweiler School

The role of the faculty at Wurzweiler is very similar to that at Ferkauf. The acting Dean of Wurzweiler, Dr. Green, who retains his faculty rank and was teaching two courses at the time of the hearings, testified that the internal operation of the school is "heavily governed" by faculty decisions. In addition to wielding great power on academic matters, the faculty has made decisions with serious budgetary consequences. For example, when Dean Green proposed a $500 tuition increase the faculty disagreed and sought an increase of only $300. The faculty's position prevailed. The faculty also made a decision to increase the size of the student body at Wurzweiler.

Faculty committees play a prominent part in the running of Wurzweiler. One such committee monitors the school's community social work program to ensure compliance with the goals of the outside agency which funds the program. Thus the com-

mittee's oversight has an important effect on retention of the program's funds.

The hiring, promotions, termination and tenure policies of the school were in a transitional state at the time of the hearings. Hiring was currently conducted by an ad hoc faculty committee which made a selection from candidates submitted by the Dean, who accepted all committee recommendations. A personnel committee has drawn up guidelines for substantial expansion of the faculty's role in questions of promotion, termination and tenure. While these guidelines have not been fully enacted to date, Dean Green confirmed that except for a minor clause which was contrary to provisions of the University's Faculty Handbook, the Wurzweiler faculty had authority to promulgate such guidelines, which were then binding on the Dean.

### 10. *Bernard Revel School*

At the time of the hearings Revel had no permanent Dean. Dr. Leo Landman, Secretary of the Faculty, was currently overseeing the day-to-day operation of the school as well as teaching two courses. Landman testified that decisions on curriculum, admissions requirements, degree requirements, and course offerings were made by consensus of the faculty. Landman further stated that the faculty's decisions were generally given effect.

According to Landman's uncontroverted testimony, department chairmen at Revel made effective recommendations regarding both full and part-time faculty hiring. In

fact, chairmen's negative recommendations in this area had always been upheld.

. * * * * * *

Two other important organs of University-wide faculty governance should be mentioned. The Faculty Review Committee is composed of eight tenured faculty members who are elected from the various schools of the University. The Committee has jurisdiction to review faculty grievances, particularly those concerning promotion and tenure. If the grievance is not satisfactorily resolved after the Committee has notified the Dean of the interested school, the Committee is authorized to recommend action to the President. Faculty members, along with students and administrators, also sit on a recently formed Committee on Academic Priorities and Resource Allocation. The purpose of this Committee is to provide a long-range scale of academic and fiscal priorities at Yeshiva. Hence, Dean Rabinowitz, a committee member, testified that the Committee is empowered to reevaluate the objectives of the schools of the University, and to review class size, staffing patterns, physical facilities, tuition levels and fund raising methods. It should be noted, however, that this committee at the time of the hearings had met only twice and had not focused upon particular problems nor made any specific recommendations.

### III

The major issue raised in this case is whether the full-time faculty[8] of Yeshiva

---

**8.** While we need not resolve the question, we note that we agree with the Board that the part-time faculty is properly excluded from the unit because they play a significantly lesser role in the affairs of the University than the full-time faculty and there is a lack of mutuality of interests between the two groups. *Trustees of Boston University v. NLRB,* 575 F.2d 301 at 308 (1st Cir. 1978); *Kendall College v. NLRB,* 570 F.2d 216 (7th Cir. 1978); *New York University,* 205 N.L.R.B. 4, 6–7 (1973). In view of our disposition we need not pass on Yeshiva's position that terminal faculty should have been excluded from the unit and two assistant deans included. Also academic is the University's argument that certain committee and department chairmen who exercise supervisory

power over non-unit personnel must, on that account, be excluded as supervisors.

One apparent rationale for the Board's inclusion of these chairmen in the unit is its so-called 50 percent rule, established by the Board in *Adelphi University,* 195 N.L.R.B. 639 (1972), under which the Board does not denominate as supervisors those faculty members who supervise nonprofessionals less than 50 percent of the time. Recently, the First Circuit cited this doctrine to support inclusion of faculty chairmen in a bargaining unit in a case where the court found such supervisory duties occupied only 5 to 10 percent of the individuals' time. *Trustees of Boston University v. NLRB, supra,* at 306 n. 4. The court withheld its view of the validity of this rule in situations involving sig-

are supervisors within section 2(11) of the Act, 29 U.S.C. § 152(11), and/or managerial personnel within the Board's own definition as adopted by the courts, and therefore whether these faculty members are improperly included as employees in the bargaining unit.[9]

■ Section 2(11) defines a supervisor as follows:

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibility to direct them, or to adjust their grievances, or to effectively recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

It is well settled in the industrial context that possession of any one of the enumerated powers in section 2(11) or the power to effectively recommend with respect to any one of them is sufficient to satisfy the statutory definition of a supervisor.[10] E. g., *NLRB v. Metropolitan Life Insurance Co.,* 405 F.2d 1169, 1177 (2d Cir. 1968); *NLRB v.*

*Quincy Steel Casting Co., Inc.,* 200 F.2d 293 (1st Cir. 1952); *Ohio Power Co. v. NLRB,* 176 F.2d 385 (6th Cir.), cert. denied, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949).

■ Managerial employees are exempted from the coverage of the Act not by explicit statutory language but as a matter of Board policy and unanimous court approval. *NLRB v. Bell Aerospace Co., Division of Textron, Inc.,* 416 U.S. 267, 285–89, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Employees who fall within this category include "'those who formulate, determine, and effectuate an employer's policies.'" *Retail Clerks International Association v. NLRB,* 125 U.S.App.D.C. 63, 66, 366 F.2d 642, 645 (1966) (Burger, J.), cert. denied, 386 U.S. 1017, 87 S.Ct. 1373, 18 L.Ed.2d 455 (1967). In *NLRB v. Bell Aerospace Co., Division of Textron, Inc., supra,* the Supreme Court emphasized the mandatory nature of the exclusion of all employees found to be managerial.

[T]he Board's early decisions, the purpose and legislative history of the Taft-Hartley Act of 1947, the Board's subsequent and consistent construction of the Act for more than two decades, and the decisions

---

nificantly greater amounts of time spent in a supervisory role. This court has specifically declined to assess the "legal justification" for the 50 percent rule. *NLRB v. Mercy College,* 536 F.2d 544, 550 (2d Cir. 1976).

**9.** Although the Board has, on a number of occasions, considered the question whether full-time faculty at a mature university are supervisors or managers under the Act, see cases cited in text at 698, *infra,* no court of appeals has squarely determined the issue. In *NLRB v. Wentworth Institute,* 515 F.2d 550 (1st Cir. 1975) the First Circuit simply rejected the Institute's argument that *all* faculty at *all* institutions of higher learning must be excluded from the Act's coverage. Limiting itself to the institution at hand, the court found that at Wentworth there was "no evidence of an instance of significant faculty impact collectively or individually on policy or managerial matters." *Id.* at 557. In *Trustees of Boston University v. NLRB, supra,* the university argued that certain department chairmen were supervisors rather than that the entire faculty should have been deemed managerial or supervisory.

**10.** It should be noted, however, that the Board has been less rigorous in denominating individ-

uals as supervisors in those cases in which the employees involved were professionals within the meaning of section 2(12) of the Act, 29 U.S.C. § 152(12). E. g., *General Dynamics Corp.,* 213 N.L.R.B. 851 (1974); *Adelphi University, supra,* at 644. In instances in which the professionals involved possessed only limited supervisory authority and exercised such authority only sporadically the courts have been willing to accept the Board's position. E. G., *Trustees of Boston University v. NLRB, supra,* at 306; *Westinghouse Electric Corp.,* 163 N.L.R.B. 723 (1967), enf'd, 424 F.2d 1151 (7th Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970). This discrepancy in the Board's approach seemingly results from the tension between the exclusion from the Act of supervisors under section 2(11) and the inclusion of professional employees under section 2(12). M. Finkin, The Supervisory Status of Professional Employees, 45 Fordham L.Rev. 805, 807–828 (1977). However, we cannot accept this rationale in the instant case, where the supervisory and managerial authority of the faculty is so pervasive and consistently exercised.

of the courts of appeals all point unmistakably to the conclusion that "managerial employees" are not covered by the Act. Id. 416 U.S. at 289, 94 S.Ct. at 1769. The Court concluded that the Board " 'is not now free' to read a new and more restrictive meaning into the Act" by which certain managerial employees would be held to be within its coverage. Id.

■ The record, which has been set forth in some detail in Part II and which is not controverted by the Board, strongly supports the contention of Yeshiva that its full-time faculty, acting at times through committees or department chairmen,[11] and at other times as a body, exercise supervisory and managerial functions as defined by section 2(11) of the Act and within the Board's prior holdings as discussed in *NLRB v. Bell Aerospace Co., Division of Textron, Inc.* We stress that our function is not to examine *in vacuo* the governance procedures of all four-year private institutions of learning described in the briefs of the *amici* universities as "mature" institutions of higher education. Many such institutions have apparently adopted a collegial decision making process in which the faculty plays a decisive role in the development of institutional policy. Given the great diversity in governance structure and allocation of power at such universities it is appropriate to address ourselves solely to the situation at the institution involved in this proceeding. *NLRB v. Wentworth Institute*, 515 F.2d 550, 556 (1st Cir. 1975). The record here discloses that in many instances the full-time faculty of the schools of Yeshiva without question effectively recommend the hiring, promotion, salary and tenure of the faculty of the University in a manner which can hardly be described as routine or clerical. They further perform managerial functions not only by their personnel decisions but by adopting the standards of admission, the curriculum, the grading system

and the graduation requirements of their school. Moreover, in particular cases the hiring of deans, the physical location of a school, teaching loads, and even the tuition to be charged were controlled by the full-time faculty. Indeed, the ability of the full-time faculty effectively to recommend or even to exercise many of the enumerated powers of section 2(11) and to formulate and effectuate University policy is not really disputed here. The Board's decision of December 5, 1975 treated the issue summarily.

> We find from our examination of the record, however, that the role and authority of the faculty herein with respect to hiring, promotion, salary increases, the granting of tenure, and other areas of governance are not significantly different from what they were in [previous Board decisions] wherein the same arguments were rejected. At Yeshiva University, faculty participation in collegial decision making is on a collective rather than individual basis, it is exercised in the faculty's own interest rather than "in the interest of the employer," and final authority rests with the board of trustees. (Citations omitted).

221 N.L.R.B. 1053, 1054 (1975). The Board concluded that "the faculty members are professional employees under the Act who are entitled to vote for or against collective-bargaining representation" and that a unit of full-time teaching faculty members was appropriate.

Thus, without any analysis the Board found that Yeshiva's full-time faculty were neither supervisors nor managerial personnel simply by stating that the substantial authority of the faculty was wielded in their capacity as professionals and by invoking three doctrines promulgated in earlier Board rulings. Since we are unpersuaded that these four justifications for the Board's decision on this point withstand

---

11. We do not dispute the Board's finding that when department chairmen at Yeshiva act on matters such as faculty appointments, tenure, salary increases and the like, they function "primarily as instruments of the faculty." See, e. g., *Trustees of Boston University v. NLRB*, supra, at 305; *New York University, supra; Fordham University*, 193 N.L.R.B. 134 (1971). Rather, this finding of the Board reinforces our belief that in a variety of ways the full-time faculty at Yeshiva wields supervisory and managerial power.

careful scrutiny, we will analyze them, *seriatim,* below.

### A. The Full-Time Faculty are Professional Employees.

■ Under section 2(12) of the Act, 29 U.S.C. § 152(12),[12] a professional employee is specifically included within the Act's coverage despite the fact that in the performance of his work he must exercise consistent discretion and judgment. Yeshiva does not argue that its full-time faculty members are not professional within the statutory definition of that term. They are obviously engaged in work which is "predominately intellectual," requiring advanced knowledge in a field of learning, and they do not perform work which is "routine mental, manual, mechanical, or physical" in nature. However, the fact that employees are professional does not preclude them from also being categorized as supervisory or managerial employees ineligible for inclusion in a bargaining unit. See, e. g., *General Dynamics Corp.,* 213 N.L.R.B. 851, 860, 862, 863 (1974); *Westinghouse Electric Corp., supra,* at 726; *American Oil Co.,* 155 N.L.R.B. 46, 48, 49 (1965); *Puget Sound Power & Light Co.,* 117 N.L.R.B. 1825, 1827 (1957). Even in an educational setting, the Board in *University of Chicago Library,* 205 N.L.R.B. 220 (1973), enf'd, 506 F.2d 1402 (7th Cir. 1974) and *Claremont Colleges,* 198 N.L.R.B. 811 (1972) excluded professional librarians from a unit of library employees because they supervised non-professionals. Hence, it has been established by the Board's own decisions that simply because individuals are professionals under section 2(12), that status *per se* does not preclude their classification as supervisory or managerial personnel.

Whether, as a matter of policy, faculty members of institutions of higher learning are advantaged or disadvantaged by collective bargaining is an issue which has understandably created divergent views.[13] But the Board, like the court, is bound both by the Act and by prior judicial interpretations of it. Unquestionably, a university full-time faculty member has the authority to determine the content of his course, the method he employs in teaching it, and the evaluation of his students' academic performance. *New York University, supra,* at 5. These factors place such faculty members squarely within the language of sec-

---

12. Section 2(12) of the Act defines a professional employee as

> (a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes; or
>
> (b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).

13. *Compare,* e. g., Kahn, The NLRB and Higher Education: The Failure of Policymaking Through Adjudication, 21 U.C.L.A. L.Rev. 63, 79–83 (1973) (hereinafter cited as Kahn); Kadish, The Theory of the Profession and Its Predicament, 58 A.A.U.P. Bull. 120, 122 (1972); and Brown, Collective Bargaining in Higher Education, 67 Mich.L.Rev. 1067, 1072 (1969), *with* The Carnegie Commission on Higher Education, Governance of Higher Education, A Report and Recommendation (1973); and Bloustein, A Chamber of Horrors?, in The Effects of Faculty Collective Bargaining on Higher Education 110 (R. Hewitt ed. 1973).

The Board acknowledges in its brief that the activities of the full-time faculty at Yeshiva might suggest managerial or supervisory status in other contexts, but not in the case of an institution of higher learning. The legal justification for a different standard for university faculty is not made clear. The Board does comment, however, that labor organizations currently administer collective bargaining agreements for faculty at over 500 colleges and universities across the country and, therefore, the Board's position comports with "widely shared recognition of the organizational rights of faculty."

tion 2(12) and these attributes of professionalism should not characterize them as managerial or supervisory.

However, the issue as we perceive it in this case involves not simply the professor's exercise of discretion in conducting the courses he is employed to teach. Rather, the issue here is the extensive control of Yeshiva's faculty over what courses are taught in the institution, who teaches them, the number of teaching hours required of the faculty, and the rank, salary, and tenure status of other faculty members. We are further concerned by the crucial role of the full-time faculty in determining other central policies of the institution including, *inter alia,* the curriculum, admissions and graduation requirements, tuition, and in one instance, even the situs of a school. When faculty members have such power— as the record indicates they do at Yeshiva— they no longer are simply exercising individual professional expertise. They are, in effect, substantially and pervasively operating the enterprise.

The Board relies in part on *General Dynamics Corp., supra,* at 857–58, where it commented that a lawyer or a certified public accountant might well as a professional "cause a change in company direction or policy which is based upon his professional advice alone," and yet should not on that account be held a managerial employee. However, we cannot reasonably equate the input of professionals in a profit-making commercial enterprise, whose advice based on their "technical expertise," id., may influence management on occasion to implement policy changes, with that of the full-time university faculty, which is here largely responsible for the conduct and direction of an institution of higher education. This is not the case of a company which hires an occasional scholar to guide it in making

engineering, legal or accounting decisions which have an impact on its business; this is the "company of scholars" itself. It is well recognized that most university faculties enjoy a state of independence and influence on policy which is "entirely unknown among the professionals in private industry." Kahn, *supra,* at 68; accord, Sands, The Role of Collective Bargaining in Higher Education, 1971 Wis.L.Rev. 150, 157. As Mr. Justice Cardozo noted: "By practice and tradition the members of the faculty are masters not servants . . .. They have the independence appropriate to the company of scholars." *Hamburger v. Cornell University,* 240 N.Y. 328, 336–37, 148 N.E. 539, 541 (1925).

Thus, while we readily concede that Yeshiva's full-time faculty satisfy the Act's criteria for professional status, we reject the Board's position that by the possession and exercise of the broad powers detailed in Part II of this opinion the full-time faculty at Yeshiva act only as professionals and not in a managerial or supervisory capacity.

B. *The Full-Time Faculty Acts Collectively.*

■ The Board here adheres to the view it first expressed in *C. W. Post Center of Long Island University,* 189 N.L.R.B. 904 (1971) and has reiterated in *Northeastern University,* 218 N.L.R.B. 247 (1975); *University of Miami,* 213 N.L.R.B. 634 (1974); *Adelphi University, supra;* and *Fordham University, supra.* The Board's position is that since the faculty's supervisory and managerial functions are exercised "on a collective basis" rather than by individual faculty members, they must be denied status as supervisory or managerial personnel. The Board's rationale is not adequately explained in this or in its prior opinions.[14]

---

14. When the Board first announced this view in *C. W. Post Center of Long Island University, supra,* at 905, it did so without benefit of analysis, and without citation to pertinent administrative decisions, judicial precedents or legislative history. In *Fordham University, supra,* the Board repeated its conclusory approach to the problem. Finally, in *Adelphi University, supra,* the Board conceded that its position arose not

from precedent but from its puzzlement in attempting to apply to the unique university governance structure terms which were "designed to cope in the typical organizations of the commercial world." Id. at 648. The Board admitted that it could not square the Act with the university setting in which "power and authority is vested in a body composed of all of one's peers or colleagues." Id. See Kahn, *supra,* at

Section 2(11) does, however, state that it is applicable to "an individual" who possesses the enumerated indicia of supervision. Since the control here in issue is not that of individual faculty member over nonprofessionals, but the collective control exercised by the faculty either in concert, through department chairmen, or through faculty dominated committees, it must be conceded that if read literally the statutory definition can be construed not to cover the full-time faculty. Since students are not employees the individual faculty supervision over students does not fit within the statutory definition, which requires that the supervisory power be directed to employees. There is the further logical difficulty of holding that the supervisory employees supervise other supervisory employees, cf. *General Dynamics Corp., supra,* at 859; *Post-Newsweek Stations, Capital Area, Inc.,* 203 N.L.R.B. 522 (1973), although this is somewhat defused when we consider that in many of Yeshiva's schools the full-time faculty also supervise collectively the activities of the part-time faculty.

Certainly, however, this Board interpretation is not the only reasonable reading of the language of section 2(11). In view of the statute's ambiguity we are disturbed by other holdings of the Board in which the collective exercise of supervisory authority was *not* grounds for exclusion from that status. Thus in *Florida Southern College,* 196 N.L.R.B. 888, 889 (1972), a case decided after the Board's rulings in *C. W. Post, supra, Fordham University, supra,* and *Adelphi University, supra,* the Board excluded a teaching dean from the faculty bargaining unit because he sat on a *committee* which made effective recommendations regarding the hiring and firing of faculty members. See also *Western Saw*

*Manufacturers, Inc.,* 155 N.L.R.B. 1323, 1329 n. 11 (1965) (foreman held a supervisor in part due to service on a board which determined employee termination). The inconsistent interpretation of this provision by the Board is also troublesome in that the Board refers this court to no legislative history of the section—and our own review has uncovered none—which clearly supports the "collective authority" doctrine which the Board urges upon us. Rather, the history of section 2(11) indicates that such collective supervision simply was not actively considered by Congress at the time. See S.Rep.No. 105, 80th Cong., 1st Sess. 3–5 (1947); H.R.Rep.No. 245, 80th Cong., 1st Sess. 13–18 (1947); H.R.Conf.Rep.No. 510, 80th Cong., 1st Sess. 35–36 (1947), U.S.Code Cong.Serv.1947, p. 1135. Indeed, one commentator has stated that there is no citable precedent for the "collective authority" approach first taken by the Board in *C. W. Post, supra.* Kahn, *supra,* at 95. Moreover, we think a construction of section 2(11) as including individuals who exercise supervisory functions as part of a group or committee is a realistic interpretation of the section since group action is so frequently encountered in modern corporate decision making. See, e. g., N. Jacoby, Corporate Power and Social Responsibility 58 (1973); H. Oleck, Non-Profit Corporations and Associations § 183 (1956).

■ We need not resolve this point, however, since there is no such "individual" statutory restriction in the Board's own concept of "managerial employees." In fact, in *NLRB v. Bell Aerospace Co., Division of Textron, Inc., supra,* the managerial personnel found not to be within the collective bargaining unit exercised their managerial functions as a "team." Id. 416 U.S. at 270, 94 S.Ct. 1757.[15] Logically, we see no

95, 120–25. In two subsequent decisions, *Northeastern University, supra,* and *Miami University, supra,* the Board refused to further analyze or reconsider the issue of the supervisory or managerial status of full-time faculty. Instead, it dismissed the question, as it did in this case, solely by reference to its earlier rulings.

15. Cf. *Sida of Hawaii, Inc.,* 191 N.L.R.B. 194, 195 (1971); *Red and White Airway Cab Co.,* 123 N.L.R.B. 83, 85 (1959); *Brookings Plywood Corp.,* 98 N.L.R.B. 794, 798 (1952). In these cases employee-shareholders were excluded from the bargaining units where in the aggregate they held sufficient shares to give them an effective voice in the formulation of corporate policy.

reason that the fact that the policies of a company are created by a group (as indeed they usually are by the Board of Directors) rather than by an individual should be of significance in determining whether an individual has managerial status, and the Board has advanced no satisfactory rationale for the weight it has given this factor.

### C. The Faculty Acts on Their Own Behalf and Not in the Interest of the Employer.

 As it has done consistently in the past,[16] the Board here denied managerial or supervisory status to the full-time faculty on the additional ground that the faculty is alleged to be acting on its own behalf and not on behalf of Yeshiva, its employer. The record in no way supports this proposition and in its argument the Board simply advances the conclusory statement that collegial action by peers is inherently action in the interest of the faculty themselves, not in the interest of the University *qua* employer. Indeed, this is characterized in the Board's brief as a "circumstance peculiar to most institutions of higher learning." However, looking at the record one cannot escape the conclusion that even assuming that the faculty's determinations on personnel, curriculum, admissions, grading, graduation requirements and other policy issues were motivated by the faculty's own best interests, the fact that the administration and Board of Trustees of Yeshiva so rarely interfered in the faculty decisions indicates that the interests of the faculty and of the University were almost always co-extensive. Cf. *NLRB v. Scott Paper Co.*, 440 F.2d 625, 630 (1st Cir. 1971) (court rejected Board's argument that tractor owner-operators were not supervisors because authority not exercised in interest of employer company on ground that interests "were so

intertwined that powers were exercised for both."); *Deaton Truck Line, Inc. v. NLRB*, 337 F.2d 697 (5th Cir. 1964), cert. denied, 381 U.S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285 (1965) (same). Certainly, the deans whom the Board found to be supervisory or managerial displayed a remarkable degree of acquiescence and often went so far as to proclaim their identity of interest with the faculty.[17] The full-time faculty as a whole or through committees have not in fact acted simply in an advisory capacity, nor have they merely made recommendations which were accorded substantial weight; their decisions on major policy issues have, for the most part proved definitive. Our review of the record leads us to conclude that at Yeshiva University, as Director Faivelson remarked of the Teacher's Institute: "The faculty is the school."

Aside from the record, there is nothing in the Board's reasoning which would support the proposition that the full-time faculty is somehow acting on its own behalf and not that of the University. In fact, a realistic assessment of the way in which a university such as Yeshiva functions, demonstrates the inapplicability of the "interest of the faculty" analysis in such a context:

> The faculty, by the very nature of the educational process in institutions of higher education, participates in decision making which in private industry would normally be regarded as a management prerogative. The faculty at most four-year colleges and universities has a voice in determining standards for admissions, curriculum, degree requirements, faculty hiring and promotion, and even tuition rates. Such a state of independence is entirely unknown among the professionals in private industry. Furthermore, in

It should also be noted that in *NLRB v. Wentworth Institute, supra,* no managerial or supervisory exclusion was found because the court perceived no evidence of "significant faculty impact *collectively or individually.*" Id. at 557 (emphasis added).

**16.** *Northeastern University, supra; University of Miami, supra; Adelphi University, supra;* see *New York University, supra.*

**17.** For example, Dean Rabinowitz of Erna Michael College testified that his role was "simply [to] carry out the mandate of the faculty," and Dean Komar of Belfer Graduate School saw his position as Dean as "first among equals".

higher education there is no sharp dividing line between the employer and the employees. The university is, ideally, a professional community in which common educational interests supersede all potential divisions between the faculty and the administration. The university's unique set of goals (education, research, and service) is achieved only by a series of specialist communities working together through their common concern for enlarging and applying their own spheres of knowledge. Thus, there is no sharp dividing line between the community of administrators and the community of faculty, for both have the common goal of striving to further the institution as a house of learning.

*Kahn, supra,* at 68 (citation omitted).

This concept of "shared authority" in the university and private four year college has its origins in the Middle Ages when teachers united "into a corporate body enjoying more or less autonomy" over the operation of the institution. McHugh, Collective Bargaining With Professionals in Higher Education: Problems in Unit Determinations, 1971 Wis.L.Rev. 55, 65 (hereinafter cited as McHugh). In 1966, a Statement on Government of Colleges and Universities, 52 A.A.U.P. Bull. 375 (1966) (hereinafter cited as Statement), which was jointly formulated and approved by the American Association of University Professors, the American Council of Education, and the Association of Governing Boards of Universities and Colleges, applauded the principle of shared authority among the Board of Trustees, the administration, and the faculty. The statement recognized that

> [t]hese three components have the joint authority and responsibility for governing the institution, and the essential and overriding idea is that the enterprise is joint and that there must be "adequate communication among these components,

and full opportunity for appropriate joint planning and effort."

*Kahn, supra,* at 71.

Whatever the situation may be in other institutions, the record here establishes no significant divergence between the interests of the faculty and those of the administration or the Board of Trustees. On the contrary, the faculty has initiated, and the administration has repeatedly accepted, major policy determinations which constitute the essence of the University's educational venture. We cannot conclude that the full-time faculty here has acted in its own interest. Even if it had, the University has accepted those decisions without hesitation so consistently that the Board's attempt to dichotomize those interests results in a strained, artificial separation. Whether the degree of control exercised by the faculty and the forbearance of the administrators is salutary fiscally and academically is not in issue here. In fact it does exist.

D. *The Faculty is Not Managerial or Supervisory Because it is Subject to the Ultimate Authority of the Board of Trustees.*

Although none of the criteria applied by the Board which we have so far discussed has any particular appeal, the concept that the faculty has neither managerial nor supervisory status because it is subject to the ultimate authority of the Board of Trustees is particularly unconvincing.[18] Normally, every corporation is ultimately operated by its Board of Directors, W. Cary, Corporations 153 (4th ed. 1969), and yet that fact obviously has never precluded a finding that there are managerial or supervisory employees in the corporation. Certainly the President and Vice-Presidents of Yeshiva as well as its Deans are subject to the ultimate authority of the Board of Trustees and yet this does not prevent them from holding managerial or supervisory status.

Section 2(11), in defining a supervisor, expressly includes those who have the pow-

---

18. The Board has also relied on this ground for denial of supervisory and managerial status to faculty in *Northeastern University, supra; University of Miami, supra; New York University, supra; Adelphi University, supra; C. W. Post Center of Long Island University, supra.*

er "effectively to recommend" any of the enumerated actions. Obviously then, the section contemplates a review by some higher authority.[19] In another context we have already indicated

> This power to review held by the immediate supervisors of the engineers whose status is at issue does not demonstrate that the latter are not "supervisors" under the Section 2(11) definition. The power to recommend promotion is, of course, not the power actually to promote and consequently *promotion recommendations will always be subject to review by those others who, in fact, have the final power to promote.*

*NLRB v. Metropolitan Life Insurance Co.,* supra, at 1177 (emphasis supplied).[20]

Private universities are usually created by charter under the corporation law of the state where they are located. *Kahn, supra,* at 124; see, e. g., N.Y.N.F.P. Corp. Law § 701 (McKinney's Supp. 1976). Hence, invariably there will be ultimate authority existing in a Board of Trustees or Directors. H. Oleck, Non-Profit Corporations, Organizations and Associations 300, 622 (1965). If this factor alone is to preclude full-time faculty members from assuming managerial or supervisory status, no matter what their actual involvement in the governance of an educational institution, then it is difficult to contemplate *any situation* where the statutory and Board-created exemptions can be applied. Of course, it may well be that at other institutions the Boards of Trustees have in fact regularly reviewed and rejected faculty recommendations, but this is not the case at Yeshiva.

## IV

We are urged by the Board that its factual findings as to employee status are entitled to great weight and are not lightly set aside. *Stop & Shop Companies, Inc. v. NLRB,* 548 F.2d 17, 18 (1st Cir. 1977); *NLRB v. Monroe Tube Co., Inc.,* 545 F.2d 1320, 1325 (2d Cir. 1976); *Amalgamated Local 355 v. NLRB, supra,* at 1000; *NLRB v. Metropolitan Life Insurance Co., supra,* at 1172. Thus, a Board determination that an individual is an employee under the Act will stand if it has warrant in the record and a reasonable basis in the statute. E. g., *Bayside Enterprises, Inc. v. NLRB,* 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977); *NLRB v. Hearst Publications,* 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).[21] However, with respect to the status of full-time faculty the Board here has made no factual findings which would preclude supervisory or managerial status, nor has the Board advanced any persuasive rationale for refusing to so categorize Yeshiva's faculty.

The Board concedes, in effect, the substantial impact of the full-time faculty both as supervisors and managers. Its denial of this status, as we have pointed out in Part III of this opinion, is based upon its continuing position, without further exposition, that full-time faculty are merely professional employees under section 2(12) of the Act. But this offers no solution to the problem since prior Board holdings and judicial opinions clearly indicate that the professional may also be supervisory or managerial. The Board has also insisted that since the faculty act collectively, they must be denied supervisory or managerial status. While there may be some arguable warrant for this position on their status as supervisors in the wording of section 2(11), there is no reason in precedent or logic why this

---

**19.** In the industrial context the Board has deemed to be supervisors those whose recommendations of the actions designated in section 2(11), although reviewed by higher authority, were consistently given effect. E. g., *Transformer Engineers,* 114 N.L.R.B. 1325, 1327 (1955).

**20.** See also, e. g., *Amalgamated Local 355 v. NLRB,* 481 F.2d 996, 999–1000 (2d Cir. 1973); *Eastern Greyhound Lines v. NLRB,* 337 F.2d 84, 86 (6th Cir. 1964); *NLRB v. Southern Airways Co.,* 290 F.2d 519, 524 (5th Cir. 1961).

**21.** Closer scrutiny of the Board's determinations, however, will result where, as here, the Board has acted inconsistently with prior rulings in reaching its decision. See *Niagara University v. NLRB,* 558 F.2d 1116, 1118 (2d Cir. 1977); B. Schwartz, Administrative Law §§ 235–36 (1976).

factor should be held to preclude managerial status for full-time faculty.

Oddly, the Board also found that department chairmen and faculty who serve on the Committee on Academic Priorities and Resource Allocation and on the University Faculty Review Committee were neither supervisors nor managers because they serve "primarily as instruments of the faculty" in these matters. If we accept the Board's argument that these chairmen and faculty committee members are simply instruments of the faculty, the Board is in the inconsistent position of finding that the full-time faculty at Yeshiva manages or supervises effectively by its collective or collegial action although this is the very process the Board utilizes to disqualify them as supervisors or managers. Another apparent contradiction is the Board's recognition of the ultimate authority of the Board of Trustees of Yeshiva although this body only acts collectively. Indeed, on the record here the "ultimate authority" of the trustees has little, if any, practical effect since, as at most universities, McHugh, *supra,* at 68; Statement, *supra,* at 376–77, the trustees' authority has been delegated to the faculty and administration.

It is clear that the Congress, when it amended the Act in 1947, had no contemplation that it would be applied to professional faculties in private institutions of higher learning.[22] Their governance is unique and has no counterpart in the commercial business models the Act was designed to regulate.[23] Absent a legislative amendment, it would seem that an appropriate method to explore fully the special problems created by the Board's assumption of jurisdiction here would be by rule-making. See *Trustees of Boston University v.*

*NLRB, supra,* at 304; *NLRB v. Wentworth Institute, supra,* at 556. Both the American Association of University Professors (which has filed an *amicus curiae* brief here) and the Association of American Universities have requested the Board to institute a rule-making proceeding to guide the determination of issues in representation cases involving faculty members of colleges and universities. On July 16, 1971 the Board denied the petition, stating in part, "The Board believes that to adopt inflexible rules for units of teaching employees at this time might well introduce too great an element of rigidity and prevent the Board from adapting its approach to a highly pluristic and fluid set of conditions." Quoted in *Kahn, supra,* at 88.

The Board here has argued that each case must rest on its own facts. However, in its adjudicative process the Board has consistently applied the rigid criteria we have discussed. In any event, in this case the facts compel the conclusion under long established standards that the full-time faculty has managerial status, and as the Supreme Court indicated in *NLRB v. Bell Aerospace Co., Division of Textron, Inc., supra,* 416 U.S. at 289, 94 S.Ct. at 1769, the Board is not now free "to read a new and more restrictive meaning into the Act." We find here that the Board, for the reasons given, has applied unjustified, arbitrary standards and therefore we refuse to enforce the Board's order. See *Niagara University v. NLRB, supra.*

**22.** The legislative history of section 2(12) mentions its applicability to lawyers, engineers, and medical personnel. There is no reference to college or university faculty. H.R.Conf. Rep.No. 510, 80th Cong., 1st Sess. 36 (1947), U.S.Code Cong.Serv.1947, p. 1135. See also *NLRB v. Wentworth Institute, supra,* at 554–55 (finding the legislative history of the Act inconclusive as to whether Congress specifically intended to exclude nonprofit educational institutions from Board jurisdiction). Prior to its de-

cision in *Cornell University,* 183 N.L.R.B. 329 (1970), the Board had refused to assert jurisdiction over nonprofit educational institutions. *Trustees of Columbia University,* 97 N.L.R.B. 424 (1951).

**23.** *Adelphi University, supra,* at 648; Kadish, The Theory of the Profession and Its Predicament, 58 A.A.U.P. Bull. 120, 122 (1972); *Kahn, supra,* at 69–74, 84–86. See also *Trustees of Boston University v. NLRB, supra,* at 304.